2017 UT App 85

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TREVOR PAUL VAN OOSTENDORP,
Appellant.

Opinion
No. 20150135-CA
Filed May 18, 2017

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 141100266

David M. Perry, Attorney for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE GREGORY K. ORME concurred. Judge J. FREDERIC VOROS JR. concurred, with opinion.

ROTH, Judge:

¶1 After a jury trial, Trevor Paul Van Oostendorp was convicted of forcible sodomy and sentenced to an indeterminate prison term of five years to life. He appeals the conviction, challenging the evidence used against him and one of the court's jury instructions. We affirm.

BACKGROUND[1]

¶2     Van Oostendorp met Victim online in April 2013 and then in person in May. They began a relationship that Victim described as initially good and that included consensual sex. However, by late summer the relationship began to sour; Van Oostendorp started to use derogatory language to describe Victim, and he became physically abusive by pushing and shoving her "a lot." Victim also found Van Oostendorp to be temperamental. His temper was often triggered by money issues related to alimony and child support from a previous marriage, and he would take his anger out on Victim.

¶3     By the fall of 2013, Van Oostendorp became more abusive. During oral sex on one occasion, he held Victim's head down until she began to vomit, telling her afterwards that he thought "it was hot." During one argument in which he accused Victim of being unfaithful, Van Oostendorp reached for a gun and threatened to hold it to her head to make sure she was answering truthfully. Although she was able to calm him down that time, Victim also recounted an incident the following January in which Van Oostendorp again threatened her with violence. After losing his temper, he told Victim "that he was going to shoot [her]. That he was going to scalp [her]. That he was going to beat [her] face in. That [her] daughter would no longer have a mother." Victim called the police, but Van Oostendorp had fled the scene by the time they arrived. Afterwards, the pair temporarily reconciled.

¶4     The next month, over Valentine's Day weekend, the two quarreled again over the phone and by text message. Although

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown*, 948 P.2d 337, 339 (Utah 1997).

they had previously made plans for the weekend, Van Oostendorp became upset and told Victim, "I'm not coming back there at all. I'm done." When Victim asked about the $1,000 Van Oostendorp owed her, he told her to "take the thousand dollars." Using a signed blank check that Van Oostendorp had previously given her, Victim did so. However, Van Oostendorp then "got irate" when he learned that she had actually followed through on his offer. He told her he had reported her to the fraud department at his bank and that she was "going to go to jail . . . [and] going to lose [her] daughter." When Victim accused Van Oostendorp of lying to the bank about the cashed check, he said, "You're damn skippy I lied." Van Oostendorp also threatened to beat Victim and claimed that she was "going to have marks" that she would need to explain away at work. Victim was "absolutely terrified" by the threats, and she called her ex-husband to ensure that he would "take care of [their daughter]" if she did not "make it out today."

¶5 Still interacting by phone and apparently having reconsidered his earlier beakup text, Van Oostendorp ordered Victim to "get ready for him" to come home by taking a bath. Although she did not know what she was getting ready for, Victim complied because she "was so scared of him and [she] just wanted to try to ease things over and try and calm him down." As Victim described the events at trial, Van Oostendorp ordered her to stand against the wall in the shower when he arrived at the house. He removed his belt, smacked her with it, and then put the belt in her mouth. He pushed her down onto her knees in the bath tub. He began to urinate "on [her] head and in [her] eyes, and it was running in [her] mouth," which she was not able to close because of the belt. As he did this, he asked Victim, "How do you like that? How do you like that?"

¶6 Van Oostendorp then got undressed, stood Victim up, and pushed her forward so that he was behind her. He spit on her anus and then "shoved" his penis into it. Victim, crying,

screamed in pain and said, "No, stop. It hurts." Van Oostendorp told Victim to be quiet because he did not want the neighbors to hear. He also forced Victim to look at herself "in the mirror with the urine in [her] hair and [her] makeup running down [her] face." Finally, he put her in the shower and told her to clean off. When Victim got out of the shower, she was in pain, physically shaking, and bleeding. When asked at trial whether the sexual encounter in the bathroom was consensual, Victim testified, "No, it was not."

¶7      The State charged Van Oostendorp with forcible sodomy, a first degree felony, under Utah Code section 76-5-403. Before trial, Van Oostendorp moved for a determination of whether Victim was competent to testify at trial and whether her testimony was reliable. The court denied the motion, finding that it had "no legitimate doubts" about her competency and that any questions of reliability "could be adequately investigated through cross-examination." Van Oostendorp also sought to exclude evidence about his history of abusive treatment of Victim under Utah Rule of Evidence 404(b), which prohibits the use of prior bad acts "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." The court allowed much of the contested evidence, but excluded some.

¶8      At trial, Van Oostendorp conceded that much of the alleged conduct, and specifically the anal sex, had taken place. Thus, whether the sodomy itself—the actus reus of the crime— had occurred was not at issue. Instead, the question for the jury was one of consent. The State put on evidence that Victim had not consented and that Van Oostendorp was at least reckless regarding the lack of consent. A significant part of the State's theory of the case involved characterizing the relationship as generally abusive. Specifically, the State characterized Victim as the subject of a pattern of domestic abuse, sexual and otherwise. Van Oostendorp's defense likewise focused on Victim's consent

and his mens rea regarding her consent. He argued that he was acting under a mistake of fact as to Victim's consent when the sexual acts underlying the charge took place, a mistaken belief he claimed was supported by the couple's pattern of consensually engaging in rough sexual activity in the past. That is, his trial theory was that he reasonably thought she consented, even if she did not.

¶9 Van Oostendorp sought a jury instruction based on this theory. While the court did not submit the requested instruction to the jury, it did add a paragraph to an existing instruction that addressed the effect of a mistaken belief as to consent. The jury convicted Van Oostendorp of forcible sodomy, and he was sentenced to a prison sentence of five years to life. He appeals.

ISSUES AND STANDARDS OF REVIEW

¶10 Van Oostendorp raises three arguments in this appeal. First, he contends that the State submitted insufficient evidence to sustain a jury verdict against him. "When a jury verdict is challenged on the ground that the evidence is insufficient, . . . [w]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Hamilton*, 827 P.2d 232, 236 (Utah 1992) (citation an internal quotation marks omitted). "We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.* (citation and internal quotation marks omitted).

¶11 Second, Van Oostendorp argues that the trial court applied rule 404(b) too broadly and erroneously allowed evidence of prior bad acts that was unduly prejudicial. "We review a trial court's decision to admit other acts evidence under

rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard." *State v. Plexico*, 2016 UT App 118, ¶ 22, 376 P.3d 1080 (brackets, citation, and internal quotation marks omitted).

¶12 Third, Van Oostendorp claims that the trial court erred when it declined to give the jury his proposed mistake of fact instruction. "Whether a trial court committed error in refusing to give a requested jury instruction is a question of law, which we review for correctness." *State v. Kruger*, 2000 UT 60, ¶ 11, 6 P.3d 1116. However, "[f]ailure to give requested jury instructions constitutes reversible error only if their omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Stringham*, 2001 UT App 13, ¶ 17, 17 P.3d 1153 (citation and internal quotation marks omitted).

ANALYSIS

I. Sufficiency of the Evidence

¶13 Van Oostendorp argues that the "[e]vidence presented by the State was not sufficient to sustain a jury verdict against [him]" because Victim "was incompetent and too unreliable to testify." Without Victim's testimony, which he contends the court should have excluded, "the chances of the State securing a conviction against [Van Oostendorp] were exceedingly miniscule, if [not] non-existent." Assuming without deciding that Victim's testimony was essential to the State's case, the question presented on appeal is whether the court properly determined that Victim was competent to testify at Van Oostendorp's trial.

¶14 "Utah law imposes a very low bar for establishing the competency of a witness." *State v. Calliham*, 2002 UT 87, ¶ 22, 57 P.3d 220. Utah Rule of Evidence 601(a) states, "Every person is

competent to be a witness unless these rules provide otherwise." However, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Utah R. Evid. 602. Although the rule requires some foundation for a witness's testimony, the standard is quite low: "It merely requires that the witness have the opportunity and the capacity to perceive the events in question." *State v. Eldredge*, 773 P.2d 29, 33 (Utah 1989).

¶15    In support of his argument that Victim was incompetent to testify, Van Oostendorp directs our attention to a single statement in Victim's psychological evaluation, which stated, "[Victim] reported that she has experienced a loss of memory for specific aspects of the alleged sodomy." As we understand it, Van Oostendorp contends that Victim's memory gaps rendered her incapable of perceiving the events in question as required by the rules of evidence, or, more specifically, that the memory gaps prevent her from recalling the events, even if she perceived them in the first instance. He relies on *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, 264 P.3d 752, to support his contention. In that case we stated that "[the witness's] admitted memory gap indicates that he lacked the capacity to 'observe,' even assuming he had the 'opportunity' to do so by being physically present at the scene." *Id.* ¶ 8.

¶16    We agree that both the capacity to perceive events and the ability to recall them are integral to a witness's competence to testify. *Id.* ("[A] lay witness is only competent to testify if . . . the witness both perceived a relevant event and can recall the event." (citation and internal quotation marks omitted)). However, *Ladd* presents a significantly different scenario from the one at issue here. In that case, the witness "clearly stated in his deposition that his account of the [event] [was] 'actually [him] reliving [his] dream' and that, putting the dream aside, he otherwise had absolutely no recollection of the [event]." *Id.* (third and fourth alterations in original). Thus, the rule of *Ladd* is

that a witness cannot testify to a matter of which she has no memory.

¶17    Here, in stark contrast, the psychological report explains the minor nature of Victim's memory gaps. For instance, the report recounted her statement that "[s]ometimes the order [of the events in the shower] will get jumbled for me." She also admitted to not remembering Van Oostendorp getting undressed during the incident, or what clothing he wore after the incident. But this sort of minor memory problem is far different from the circumstances in *Ladd*, where the witness conceded that he had absolutely no recollection of an event aside from a dream.

¶18    In addition, the record demonstrates that Victim had both the opportunity and the capacity to perceive the sodomy, and that she could recall the event in detail. For example, Victim's testimony about the act itself—not including the lead up and aftermath—covers three pages of transcript, over half of which is comprised of her recounting the crime in specific detail without interruption or prompting by court or counsel. And her testimony made clear that her memory was based on her direct perception of the events as they occurred.

¶19    When addressing this issue below, the trial court determined that any questions about Victim's ability to testify accurately and truthfully about the incident, including exploration of any memory gaps, "could be adequately investigated through cross-examination." We agree. Victim was present during the event. She had the capacity to perceive the event, and she later recalled what happened in detail. Any minor memory gaps she displayed related to her credibility as a witness, if anything, not to her competency to give testimony. *See State v. Prater*, 2017 UT 13, ¶¶ 31–32, 392 P.3d 398 (explaining that the jury is the exclusive judge of both witness credibility and the weight to be given particular testimony unless the testimony "was so unreliable that it cannot form the

basis of a conviction"); *see also State v. Christensen*, 2016 UT App 255, ¶ 20, 387 P.3d 588 (determining that a victim was competent to testify even though the effects of a drug rendered her memory incomplete).

¶20    Because "[t]he jury is the exclusive judge of credibility," Utah Code Ann. § 78B-1-128(4) (LexisNexis 2012), "we will not act as a second trier of fact" on appeal, *Prater*, 2017 UT 13, ¶ 41. We therefore conclude that the trial court did not abuse it's discretion in determining that Victim was competent to testify at trial and that any questions about her credibility were properly left to the jury.[2]

---

2. Van Oostendorp also seems to argue that Victim's testimony was unreliable and should have been excluded under rule 403, which allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. Van Oostendorp apparently contends that the same memory lapses that rendered Victim incompetent to testify also made her testimony so unreliable as to be unfairly prejudicial. Like his competency argument, however, this contention is about Victim's credibility as a witness, not the reliability of her testimony. And as we have discussed, credibility questions are wholly within the province of the jury. Van Oostendorp has not undertaken the analysis necessary to demonstrate that Victim's testimony was incredible as a matter of law. *See State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (explaining that the only exception to the general rule prohibiting appellate courts from "reassessing or reweighing evidence" occurs when testimony "is so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt" (citation

(continued…)

---

## II. Prior Bad Acts Evidence

¶21 Van Oostendorp next claims that the trial court erroneously allowed "a wide variety of evidence of prior 'bad acts' under Utah Rule of Evidence 404(b)," much of which "had no bearing on whether the alleged crime had taken place, and was used in a manner that served to impermissibly impugn [Van Oostendorp's] character."

¶22 Rule 404(b) controls the intersection of two competing evidentiary interests. On one hand, the rule recognizes the "dangers of exposing a jury to evidence of a defendant's acts of prior misconduct—specifically, the risk that the jury will infer that the defendant has a reprehensible character, that he probably acted in conformity with it, and that he should be punished for his immoral character." *State v. Thornton*, 2017 UT 9, ¶ 35, 391 P.3d 1016 (citation and internal quotation marks omitted). "On the other hand, the rule also recognizes that acts of prior misconduct may also sustain an alternative—and entirely permissible—inference." *Id.* ¶ 36. The rule can be difficult to apply, however, because "evidence of prior bad acts often will yield dual inferences—and thus betray both a permissible purpose and an improper one." *Id.* ¶ 37 (citation and internal quotation marks omitted).

---

(…continued)
and internal quotation marks omitted)). Without such an analysis, Van Oostendorp cannot meet the heavy burden to show an error. *See State v. Jones*, 2015 UT 19, ¶ 29, 345 P.3d 1195 ("Rule 403 imposes on [Van Oostendorp] the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it substantially outweighs the probative value." (brackets and internal quotation marks omitted)).

¶23 "Stated succinctly, to be admissible, evidence of prior bad acts must be relevant and offered for a genuine, noncharacter purpose; furthermore, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice." *State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841, *abrogated in part on other grounds by Thornton*, 2017 UT 9, 391 P.3d 1016. "The threshold 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *Thornton*, 2017 UT 9, ¶ 58 (emphasis omitted). Thus, a trial court's job when confronted with a dispute under rule 404(b) is first "to assess the avowed basis for evidence of prior misconduct." *See id.* ¶ 56. If the evidence is relevant and offered for a proper purpose, the court moves on "to judge its likely effect in prejudicing or confusing the jury" under rule 403. *See id.* To assist in the trial court's determination, our supreme court has articulated factors that "may be helpful" in a rule 403 analysis—the so-called *Shickles* factors. *See Lucero*, 2014 UT 15, ¶¶ 31–32 (stating that a court "may consider" the factors announced in *State v. Shickles*, 760 P.2d 291 (Utah 1988)).[3]

---

3. Recently, our supreme court precedent has relegated the *Shickles* factors to marginal status. The court explained that, "while some of these factors may be helpful in assessing the probative value of the evidence in one context, they may not be helpful in another. It is therefore unnecessary for courts to evaluate each and every factor and balance them together in making their assessment." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated in part on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *see also State v. Lowther*, 2017 UT 24, ¶ 41. "This is because courts are bound by the text of rule 403, not the limited list of considerations outlined in *Shickles*. . . . Simply put, a trial court may exclude evidence if 'its

(continued…)

¶24 The trial court followed this process here. The State moved to admit evidence of prior bad acts and Van Oostendorp contested its admissibility under rule 404(b). After receiving briefing from both parties, the court held a hearing on the matter and issued a written order. In its order, the trial court analyzed fifteen categories of evidence offered by the State to consider whether they passed muster under rule 404(b) and rule 403. The court determined that six categories did not meet the rules' requirements but that nine did, including all four categories that Van Oostendorp now challenges. On appeal, "the question for us is not whether we would have admitted this evidence. It is whether the district [court] abused [its] broad discretion in doing so." *Thornton*, 2017 UT 9, ¶ 56.

¶25 Van Oostendorp argues that the trial court erred in admitting a wide array of prior bad acts evidence under rules 403 and 404(b). Before addressing these arguments, the context of the trial is helpful background. As we explained above, each party's theory of the case centered on the issue of consent—the State argued that Victim did not consent to the sodomy, while Van Oostendorp argued that, even if she did not consent, he reasonably believed she did. In its case in chief, the State focused on the nature of the relationship. Specifically, the State used prior bad acts evidence to show that the relationship was generally abusive and to portray Victim as the frightened and demoralized target of Van Oostendorp's abuse. In defense, Van Oostendorp's theory of the case was that "much of the [bad acts evidence] was part and parcel to the couple's submissive/dominant type of sexual [relationship] that was completely consensual."

---

(…continued)

probative value is substantially outweighed by' a number of considerations, including 'the danger of unfair prejudice.'" *Lucero*, 2014 UT 15, ¶ 32 (quoting Utah R. Evid. 403).

¶26    On appeal, Van Oostendorp asserts that four types of evidence should have been excluded from trial: his text messages to Victim that included disrespectful language and name calling; evidence that Van Oostendorp viewed Victim as a sex object; evidence of his use of a weapon to intimidate Victim and associated death threats; and an alleged threat to stab Victim with a knife the day after the charged events. These four individual types of evidence fall into two broad categories: first, Van Oostendorp's demeaning treatment of Victim, including the text messages with name-calling and disrespectful language, and the "sex object" evidence; and second, the threats of violence against her.

¶27    In its pretrial evidentiary ruling, and with both parties' theories of the case in mind, the court addressed each category of evidence that Van Oostendorp now contests. With regard to the first, the court determined that evidence of Van Oostendorp's disrespectful language and name calling was "relevant to the overall story from both parties." The court also chose to consider the *Shickles* factors and found that "the strength of the evidence is sufficient, [the text messages] are close in time, need has been shown, and they are no worse than the crime charged." Likewise, the court allowed evidence that Van Oostendorp viewed Victim as a sex object because such evidence was "part of both parties' theories of the case."

¶28    Van Oostendorp claims the court erred in admitting a "vast number of text messages" because "problems arise at every step" of a rule 403 balancing test based on the *Shickles* factors. Specifically, he contends that there was no non-character purpose for the evidence of disrespect and name calling and that it was not relevant to the State's case. He also claims that the "sex object" evidence had "no bearing on whether the sexual assault alleged occurred or not." However, Van Oostendorp does not support his contentions with descriptions and analysis of any specific text messages, or even groups of messages, that

he claims the trial court wrongly allowed into evidence; rather, he presents us with a single "see generally" record citation to four volumes of trial transcript. Those four volumes encompass almost all the non-expert testimony presented in the case and span more than 780 pages. We decline to sift through days of trial transcript on Van Oostendorp's behalf. *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) ("[T]his court is not a depository in which the appealing party may dump the burden of argument and research." (citation and internal quotation marks omitted)).

¶29 Even if Van Oostendorp had cited discrete portions of the record, he has still not shown how the trial court abused its discretion when it admitted the texts. To be sure, Van Oostendorp suggests that the court should have weighed the *Shickles* factors differently. As we explained above, though, the *Shickles* factors "may be helpful" to a court in applying the text of rule 403, but applying them is not required. *See State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated in part on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Rather, the operative question is a broader one—whether the "probative value [of the evidence] is substantially outweighed by a number of considerations, including the danger of unfair prejudice." *Id.* (citation and internal quotation marks omitted). That balancing exercise is necessarily a matter of discretion.

¶30 Here the trial court issued an order that explained in some detail the basis for its decision to admit the disputed evidence. That explanation seems reasonable on its face. *See Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 6, 63 P.3d 686 ("We . . . will not overturn a lower court's determination of admissibility [under rule 403] unless it is beyond the limits of reasonability." (citation and internal quotation marks omitted)). Van Oostendorp fails to explain how the trial court's actual analysis of the specific evidence at issue was unsound.

¶31 For instance, the court determined that the text messages and "sex object" evidence were relevant to both the State's

theory *and* Van Oostendorp's theory of the case. Indeed, in keeping with his claim to have been mistaken about Victim's lack of consent to the sexual acts with which he was charged, Van Oostendorp "testified at length that [the] back and forth" in the text messages was a "playful, erotic, and consensual" part of the relationship rather than disrespectful and abusive. And evidence that he treated her as a sex object throughout their relationship, which Van Oostendorp candidly acknowledges "could loosely apply . . . to a vast majority of the interactions between" the two, is clearly relevant to whether he actually misperceived Victim's lack of consent to the sodomy or simply had so little regard for Victim that her consent—or lack thereof—was of no interest to him at all.

¶32    Without any meaningful analysis, it is not evident how the court's decision to admit evidence that Van Oostendorp himself relied on was unreasonable. Because he does not engage with the trial court's reasoning, Van Oostendorp has not persuaded us that the court abused its discretion. *See Allen v. Friel*, 2008 UT 56, ¶¶ 14–18, 194 P.3d 903 (noting that, for an appellant to persuade a reviewing court that the district court's determinations were in error, the appellant must engage with and challenge the actual bases of the district court's decisions).

¶33    With regard to the second category of evidence, the trial court allowed testimony that Van Oostendorp had made threats against Victim, involving weapons, during two separate confrontations. The court determined such evidence was "relevant to establish an abusive/domestic violence relationship" and that it went "to the alleged victim's state of mind and to the issue of consent on the part of the victim," both non-character purposes. The court then concluded that the evidence would not unduly prejudice the jury because the evidence was "no worse than the alleged crime."

¶34    Van Oostendorp argues that the court should have excluded this evidence because the question of whether a gun

was involved during an argument with Victim "came down to a 'he said/she said' confrontation" and that there "was no real non-character purpose for offering [the] evidence." He also claims that the evidence of threats had "no bearing on whether the alleged assault [he was charged with] ever took place." And as with the text message evidence, Van Oostendorp asserts broadly that, in analyzing the evidence "under the *Shickles* factors, such evidence should not have been allowed."

¶35    It is true that the evidence in question was not relevant to whether the sexual act underlying the sodomy charge actually took place, but that was not an issue at trial—Van Oostendorp admitted that it had, but claimed it was consensual. The State offered the evidence for the purpose of rebutting that very claim. In its order, the trial court determined that the evidence satisfied the *Shickles* factors, was "relevant to establish an abusive/domestic violence relationship," and "[went] to the alleged victim's state of mind." That is, the court determined that there was a non-character purpose for the evidence, that it was relevant, and that any danger of unfair prejudice did not outweigh the probative value of the evidence. *See State v. Lucero*, 2014 UT 15, ¶ 13, 328 P.3d 841, *abrogated in part on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016 (laying out the test for admissibility of prior bad acts evidence).

¶36    We agree with the trial court. The evidence was highly probative, specifically on the issue of Victim's consent—the key issue on which Van Oostendorp's defense turned. Indeed, his defense opened the door to evidence about his own state of mind. *See State v. Rees*, 2002 UT App 347U, para. 3 ("The trial court did not abuse its discretion in admitting the [404(b)] evidence because [the defendant] had already put his intent and his alleged mistake regarding the victim's consent squarely at issue."). The prosecution used evidence of his threats to harm Victim with weapons to rebut Van Oostendorp's theory that he justifiably believed that Victim had consented to the charged act

of sodomy because she had agreed to rough sex in the past. The State's rule 404(b) evidence responded to that claim by painting a picture of the defendant as a bully not particularly attentive to the nuances of a consensual sexual relationship, and also by suggesting that any apparent cooperation by Victim in rough or demeaning sex acts in the past was a product of the abusive and threatening environment Van Oostendorp had created and not her own free will.

¶37   Thus, all the evidence at issue on appeal was relevant to rebut Van Oostendorp's defense that he reasonably assumed Victim consented to the acts underlying the charges because she had consented to similar acts before. And because the trial court determined that the State clearly offered the evidence for a noncharacter purpose, it would take more than the conclusory analysis Van Oostendorp has provided on appeal to persuade us that the trial judge exceeded his "discretion in deciding that the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice." *Thornton*, 2017 UT 9, ¶ 63, (internal quotation marks omitted). For these reasons, we are not persuaded that the trial court abused its discretion when it admitted the evidence Van Oostendorp challenges on appeal.

### III. Jury Instruction

¶38   Finally, Van Oostendorp argues that the trial court erred when it declined to give the defense's proposed mistake-of-fact instruction to the jury. The court should have issued the instruction, he claims, because, "if the evidence supports an affirmative defense, the State has the burden to prove beyond a reasonable doubt that the defense does not apply."

¶39   In the proceedings below, Van Oostendorp argued that he had a statutory right to raise mistake-of-fact as an affirmative defense. *See* Utah Code Ann. § 76-2-304(1) (LexisNexis 2012) ("Unless otherwise provided, ignorance or mistake of fact which disproves the culpable mental state is a defense to any

prosecution for that crime."). The court agreed. Van Oostendorp proposed language that, he claimed, properly instructed the jury on his mistake-of-fact defense and the applicable burden of proof. The State objected to the instruction and the court heard argument on whether to give it. Ultimately, the court decided not to give the proposed instruction to the jury because there was no clear Utah precedent for doing so. However, the court did agree to add language to the existing elements instruction in keeping with this court's decision in *State v. Marchet*, 2012 UT App 197, 284 P.3d 668. Specifically, the court added one paragraph to the existing elements jury instruction. It read, "If you are convinced that the defendant honestly and reasonably believed that [Victim] consented to the sexual activity with the Defendant then you must find the defendant NOT GUILTY."

¶40   Van Oostendorp's point on appeal is that his testimony and the testimony of his expert witness entitled him to a separate jury instruction addressing his alleged mistake of fact as to Victim's consent. Accordingly, Van Oostendorp contends that the trial court erred in rejecting the proposed instruction. As we understand it, Van Oostendorp believes that the court's decision to "add some language"—the additional paragraph quoted above—instead of giving the jury his proposed instruction verbatim denied him the right to present his theory of defense. Yet Van Oostendorp's brief neither quotes nor describes the rejected instruction. Nor does Van Oostendorp quote or describe the language the court added to the elements instruction for the express purpose of presenting the jury with an alternative description of the mistake defense Van Oostendorp had offered. Instead, Van Oostendorp has simply attached a number of jury instructions to the brief. But these are not labeled or referred to in the text of the brief and we are not told which of these instructions were given and which rejected. More importantly, Van Oostendorp has not compared or contrasted the instruction he proposed with the one the trial court gave to the jury as an alternative.

¶41 "Failure to give [a] requested jury instruction[] constitutes reversible error only if [its] omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Stringham*, 2001 UT App 13, ¶ 17, 17 P.3d 1153 (citation and internal quotation marks omitted). Thus, where the trial court adds language to a jury instruction to accommodate the theory of the case embodied in the defense's proffered jury instruction, and the defendant claims on appeal that the added language failed to protect his rights, we expect the defendant's opening brief to identify the language at issue and explain its deficiencies. And because Van Oostendorp's brief does not, he has not persuaded us that a reversible error occurred.[4] *See id.*

## CONCLUSION

¶42 We conclude that Victim was competent to testify at trial and that there was therefore sufficient evidence for a jury to convict. Further, Van Oostendorp has not persuaded us that the

---

4. Van Oostendorp does not acknowledge the trial court's additional jury instruction language until his reply brief, and he does so then only after the State argued that the failure to do so in his opening brief was a basis for affirmance. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that [arguments] . . . that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (citation and internal quotation marks omitted)). And in his reply, Van Oostendorp finds fault only with the court's inclusion of the word "honestly" in the phrase "honestly and reasonably believed." We therefore do not reach the issue of whether the trial court's added language was a correct statement of the law.

trial court erred in admitting evidence of prior bad acts or that the jury instructions violated his rights. Affirmed.

———————

VOROS, Judge (concurring):

¶43    I concur in the opinion of the court. I write separately only to emphasize what I believe to be the limited role of the so-called *Shickles* factors in rule 403 analysis.

¶44    Our supreme court has clarified that Utah courts are "bound by the text of rule 403." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. In contrast, "the *Shickles* factors were not rooted in the text of the operative rule; they were 'drawn from' the McCormick on Evidence treatise.'" *State v. Rushton*, 2017 UT 21, ¶ 53 n.2 (Lee, Associate Chief J., concurring in the judgment) (quoting *Lucero*, 2014 UT 15, ¶ 32). "And in time [our supreme court was] forced to repudiate the *Shickles* factors—identifying unforeseen consequences arising from an attempt to formulate factors not rooted in the text of the governing law, and backing away from the *Shickles* factors and pointing the courts back to rule 403." *Id.* Accordingly, "the *Shickles* factors should not limit the considerations of a court when making a determination of evidence's admissibility under rule 403." *State v. Cuttler*, 2015 UT 95, ¶ 18, 367 P.3d 981. Indeed, the supreme court has now ruled that a district court abuses its discretion "by mechanically applying the *Shickles* factors." *State v. Lowther*, 2017 UT 24, ¶ 47.

¶45    However, our supreme court has also recently rejected the idea "that the *Shickles* factors, taken individually, have no place in a rule 403 analysis. It may very well be appropriate, for example, for a district court to consider the similarities between the crimes in assessing probative value." *Cuttler*, 2015 UT 95, ¶ 19. Thus, "we focus our analysis on the text of rule 403 and analyze only those *Shickles* factors that are relevant to the

circumstances of [the present] case." *State v. Reece*, 2015 UT 45, ¶ 69, 349 P.3d 712.

¶46 But I see no legal relevance in whether a factor is found on the *Shickles* list. All that matters is that it aids the court in applying the law, i.e., the text of rule 403. One or more of the *Shickles* factors may sometimes help, but the same can be said of non-*Shickles* factors, such as "the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way," *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006) (citation and internal quotation marks omitted), and "the extent to which admission of evidence will require trial within trial," *State v. Rollins*, 760 S.E.2d 529, 551 (W. Va. 2014) (citation and internal quotation marks omitted). And of course our supreme court has proscribed one *Shickles* factor, "the degree to which the evidence probably will rouse the jury to overmastering hostility." *See State v. Shickles*, 760 P.2d 291, 296 (Utah 1988), *abrogated by Cuttler*, 2015 UT 95, ¶ 20 (holding that "it is inappropriate for a court to consider the overmastering hostility factor in a rule 403 analysis"). In short, whether a factor is useful to a court in conducting a 403 balancing has everything to do with relevance under the circumstances and nothing to do with appearing on the *Shickles* list.

¶47 I believe this is our supreme court's approach. But it appears to me that this nuanced approach may not be sufficient to drive a stake into the heart of *Shickles*. Perhaps the time has come to hold that *any* reference to the *Shickles* factors constitutes reversible error.

¶48 I also add this observation: when a relationship marked by bullying, threats, or violence culminates in an accusation of sexual assault answered by a claim of consent, evidence of that history of abuse will almost always satisfy rules 402, 403, and 404(b). It will almost always be highly probative and almost never be *unfairly* prejudicial. If our rules of evidence are to reflect the real world, they must recognize that the question of consent

must be viewed through the lens of the couple's entire relationship. And just as a history of consensual sex is relevant to whether a sexual partner consented on a particular occasion, *see* Utah R. Evid. 412(b)(2), so also is a history of abuse, *see State v. Diak*, No. 98-2004-CR, 1999 WL 19306, at *5 (Wis. Ct. App. Jan. 20, 1999) (holding the couple's history of abuse relevant to whether the victim consented to sex). A jury could reasonably conclude that a history of violence elevates an otherwise noncoercive demand for sex to the level of a "threat[] to retaliate in the immediate future against the victim" if she refuses to comply. *See* Utah Code Ann. § 76-5-406(4)(a)(i) (LexisNexis Supp. 2016).

¶49　Constitutional law provides a useful analogue. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Otherwise stated, "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). This question is "to be determined from the totality of all the circumstances." *Id.* at 223. I see no reason why a less robust version of consent should apply in the context of sex crimes.[5]

―――――――――

5. I am of course not suggesting that a criminal defendant bears any burden of proving consent in a criminal prosecution; I am suggesting only that the "consent"—whose absence the prosecutor must prove beyond a reasonable doubt—means consent that was the product of a free and unconstrained choice under a totality of the circumstances, including the couple's history.