2021 UT App 87

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DYLAN JAMES KITZMILLER,
Appellant.

Opinion
No. 20190716-CA
Filed August 12, 2021

Third District Court, West Jordan Department
The Honorable William K. Kendall
No. 171403744

Wendy M. Brown, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

SENIOR JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.[1]

APPLEBY, Senior Judge:

¶1    Dylan James Kitzmiller was convicted on two counts of
child abuse in connection with the death of his girlfriend's
newborn baby. On appeal, he argues (1) his trial counsel was
ineffective for failing to request a separate unanimity jury
instruction and that the district court plainly erred by not

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

providing one sua sponte,[2] (2) the district court erred by refusing to give a jury instruction pertaining to an in-custody informant and trial counsel was ineffective for failing to make additional arguments on the matter, and (3) there was insufficient evidence to support the jury's verdict. We affirm.

## BACKGROUND

¶2   Kitzmiller and his girlfriend (Girlfriend) were living in his mother's basement when Girlfriend's newborn baby (Baby) died. Baby was born with no known health problems on September 4, 2017. One evening approximately two weeks later, emergency responders were called to the household because Baby had stopped breathing.

¶3   Responding medical professionals pronounced Baby dead at the scene. The fire battalion chief noticed that Baby was "emaciated" and "had a lot of injuries." He requested detectives be sent to the scene "because it looked like non-accidental trauma." The first police officer to arrive observed that Kitzmiller was "crying" and "upset," but nevertheless thought Kitzmiller's demeanor was unusual: "What struck me was he wouldn't look any officer in the eyes as they would walk past. He kind of ducked his head, covered his eyes, and wouldn't look me in the eye. I was standing right next to him." Another officer described Kitzmiller as appearing "very nervous, almost a little bit panicky, [and] unsure of what he was going to do." And a third officer described Kitzmiller as being angry and defensive when questioned, whereas Girlfriend exhibited more of a "concerned" demeanor throughout.

---

2. "Sua sponte" is a Latin term meaning "on its own motion" or "[w]ithout prompting or suggestion." *Sua Sponte*, Black's Law Dictionary (11th ed. 2019).

¶4 A crime scene investigator discovered diapers with "a lot of blood on them" in the downstairs bathroom and clothes with "quite a bit of blood" on them in the hamper, including baby clothes and what the investigator assumed were men's shirts.

¶5 In performing an autopsy on Baby's body, the medical examiner noted many injuries, including abrasions on both ears, multiple abrasions on his nose, redness and ulceration on his lower lip and chin, possible bruising on the right side of his forehead, scrapes on the backs of his fingers on each hand, a lesion on his left palm, a "fairly large" bruise on his left arm, bruises on each side of his torso and his chest, a recently broken right arm, and torn nerves and bleeding in his brain caused by a traumatic event—indeed, the autopsy suggested that there were at least two traumatic events because some bleeding in Baby's brain was older than other bleeding. The autopsy also showed that Baby had recently suffered a rib fracture, which was caused by "[e]xtremely forceful" "shaking or shaking with an impact."

¶6 After the medical examiner classified Baby's death as a homicide caused by "blunt force injuries," Kitzmiller and Girlfriend were each charged with one count of murder and three counts of child abuse. Girlfriend subsequently entered into a plea agreement with the State, pleading guilty to two counts of child abuse (for using drugs while nursing Baby and permitting Kitzmiller to abuse him) in exchange for testifying against Kitzmiller.

¶7 At Kitzmiller's trial, Girlfriend testified that in the first days after Baby's birth, Kitzmiller looked after Baby but handled him "[v]ery carelessly." She said Kitzmiller was "jealous" of the time she spent tending to Baby and was frequently angered by Baby's crying. Among the specific things she observed were Kitzmiller not supporting Baby's head; swaddling Baby face down on the carpet; peeling off irritated skin on Baby's nose, lip, and mouth; tossing Baby back-and-forth between his hands;

tossing Baby into the air; and tossing Baby in frustration onto a mattress and box spring. She also described a time when Kitzmiller angrily shook Baby: "[Kitzmiller] was holding [Baby] up at chest level by his shoulders and [Baby] was crying, and he was shaking him and calling him stupid and saying he didn't understand why [Baby] wouldn't stop crying." Girlfriend also recalled asking Kitzmiller about a bruise on Baby's cheek a few days before he died, and Kitzmiller responding that Baby accidently fell off the bed. And she testified that when she wanted to take Baby to the doctor to have some injuries checked, Kitzmiller responded, "If we take him to the doctor they're going to take him away from you."

¶8     Girlfriend testified that on the day Baby died, she left him with Kitzmiller while she went upstairs to visit with guests. A couple of hours later she returned to get Baby and found him "undressed and freezing" and "really irritated." Girlfriend dressed Baby and took him upstairs to show him to the guests; at this point, Kitzmiller left the house. A little later, Girlfriend gave Baby some gas drops, fed him, and lay down with him for a nap. When Baby awoke, he was more irritated, and Girlfriend and Kitzmiller's mother spent a couple of hours trying to calm him. Sometime after Kitzmiller returned that evening, Girlfriend was finally able to soothe Baby to sleep.

¶9     Girlfriend testified that after she put Baby to bed, she went upstairs to call a friend and told the friend that she feared for herself and Baby because of Kitzmiller's "outbursts of anger and his abuse of [her] and of [Baby]." Girlfriend then elaborated that part of her concern stemmed from bite marks on Baby's hands caused by Kitzmiller.

¶10    After the phone call, Girlfriend returned downstairs to find Baby awake and undressed, with Kitzmiller making "some kind of bicycling motion" with Baby's legs. Girlfriend described Kitzmiller's demeanor: "Just strange. Like he wasn't happy. He

wasn't angry. Just like he wasn't all there, really." Girlfriend testified that she calmed Baby and put him back to sleep, but after lying down and listening to Baby breathe for forty-five minutes, she heard him gasp. She testified that she picked up Baby, realized he was not breathing, and called 911.

¶11   Girlfriend also testified about her first phone call with Kitzmiller after Baby's death, which occurred when Kitzmiller had been missing for "most of that day." She said that when she asked where he had been, Kitzmiller responded that he "had tried to kill himself because [Baby] was not alive anymore and he thought it was his fault."

¶12   The medical examiner who performed the autopsy also testified at trial, cataloguing Baby's injuries and explaining the classification of his death as a homicide. And a child abuse pediatrician who attended the autopsy testified about the kinds of actions that would cause the injuries Baby sustained. She offered her conclusion that "the massive amount of blood around his brain," "damage to the brain itself," and "significant swelling of the brain" caused Baby's death; she also concluded that it was not possible for an accident to have caused such injuries.

¶13   The jury returned a not-guilty verdict on the murder count (Count I) and one of the child abuse counts (Count III), but found Kitzmiller guilty on the other two child abuse counts (Counts II and IV). Kitzmiller appeals.

ISSUES AND STANDARDS OF REVIEW

¶14   Kitzmiller argues, for the first time on appeal, that his constitutional rights were violated because the jury was not given a separate instruction requiring it to reach a unanimous verdict. "A failure to preserve an issue in the trial court generally precludes a party from arguing that issue in an appellate court,

absent a valid exception." *State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443. Kitzmiller argues that two exceptions apply in this case, asserting that the district court plainly erred by failing to give a separate unanimity instruction and that trial counsel rendered ineffective assistance by failing to request such an instruction. *See generally id.* ¶ 19 (recognizing the exceptions to the preservation rule of plain error and ineffective assistance of counsel). "Plain error is a question of law reviewed for correctness." *State v. Smit*, 2004 UT App 222, ¶ 7, 95 P.3d 1203. Similarly, "when a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

¶15 Kitzmiller next argues that the district court erred in denying his request for a jury instruction addressing testimony from an in-custody informant. "The refusal to give a jury instruction is reviewed for abuse of discretion, although in some circumstances that discretion will be narrowly constrained." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208 (quotation simplified). Further, "when reviewing jury instructions, we look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Lambdin*, 2017 UT 46, ¶ 41, 424 P.3d 117 (quotation simplified).

¶16 As an alternative argument on the issue of an in-custody informant instruction, Kitzmiller also argues that his counsel rendered ineffective assistance by failing to provide "additional legal argument or a more tailored proposed instruction for the trial court to consider." Again, an ineffective assistance of counsel claim first raised on appeal presents a question of law. *Beckering*, 2015 UT App 53, ¶ 18.

¶17 Kitzmiller finally argues there was insufficient evidence presented to support his two child abuse convictions. When addressing such a challenge, "our scrutiny of the evidence is limited: We review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Hamilton*, 827 P.2d 232, 236 (Utah 1992) (quotation simplified). "Moreover, we assume that the jury believed the evidence supporting the verdict. A jury conviction will be reversed for insufficient evidence only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict. We will not lightly overturn a jury verdict." *State v. Widdison*, 2001 UT 60, ¶ 74, 28 P.3d 1278 (quotation simplified).

ANALYSIS

I. Separate Unanimity Jury Instruction

¶18 Kitzmiller argues he was denied his constitutional right to a unanimous jury verdict because the district court did not provide a separate unanimity instruction, which would have made clear that the jury must unanimously determine which acts Kitzmiller committed to support the child abuse convictions. He concedes this argument was not preserved but argues that we may consider it under two exceptions to the preservation requirement—plain error and ineffective assistance of counsel.

¶19 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346 (quotation simplified). "To succeed on an ineffective assistance of counsel claim, [a defendant] must show both that counsel's performance was deficient and that the deficient

performance prejudiced the defense." *State v. Beckering*, 2015 UT App 53, ¶ 21, 346 P.3d 672 (quotation simplified).

¶20 Assuming, without deciding, that each preservation exception otherwise applies in this case, we nevertheless determine that Kitzmiller has not satisfied the prejudice prong required to show either plain error or ineffective assistance of counsel. That is, he has not shown there is a reasonable likelihood that if a separate unanimity instruction had been requested and given, the trial result would have been different. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 ("To establish prejudice [for an ineffective assistance of counsel claim], a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation simplified)); *State v. Dean*, 2004 UT 63, ¶ 22, 95 P.3d 276 ("Under the plain error doctrine, a defendant must not only demonstrate that the error was obvious, but also that it was harmful or of such a magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant. This harmfulness test is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel." (quotation simplified)).

¶21 At the outset of our analysis, we note that in the final jury instructions, given just before deliberations, the district court gave a general unanimity instruction, explaining, "Because this is a criminal case, every single juror must agree with the verdict before the defendant can be found guilty or not guilty." The court also instructed the jury that it must consider each charge separately and further clarified, "Your verdict on one charge does not determine your verdict on any other charge."

¶22 Nevertheless, Kitzmiller argues that the absence of a separate unanimity instruction was harmful because the jury was unclear as to which alleged injuries related to which of the

three child abuse charges. We disagree that the jury was confused on this matter. Counts II, III, and IV were all child abuse charges based on the same statutory section, but the Information—which was once read verbatim to the jury and then later referred to in the preliminary jury instructions—specified which injuries Kitzmiller allegedly caused that corresponded to each count: "a comminuted spiral fracture of [Baby's] right humerus" for Count II;[3] "a fracture of [Baby's] first left rib" for Count III; and "multiple injuries, including bruises/abrasions to [Baby's] hands, ear, chest, flanks, upper arms, and chin" for Count IV. And during closing argument, the prosecutor also clarified which injuries supported which counts of child abuse:

> There's four counts in this case. There's the murder count and then there's three child abuse counts. The three child abuse counts deal with the fact of the other injuries that [Baby] had.
>
> When [Baby] was examined, it was found that his arm was broken. . . . That's one of the child abuse counts.
>
> The other child abuse count[] is the first rib fracture . . . . That happens when the head goes back and forth.
>
> The third count happens to do with all the other injuries. The blunt force trauma that [Baby] had, that he had all over his entire body—on his

---

3. According to expert testimony presented at trial, a comminuted fracture is one in which the bone is broken into "more than two pieces." *See also Comminuted*, Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/medical/ comminuted [https://perma.cc/X7WB-WEAK].

mouth, on his nose, the bruising on his arm, his
hands, his little hands, both hands, his chest, his
hip, his trunk area. That's what the third count
refers to.

Thus, where the prosecutor mentioned the three separate child
abuse counts, tied each to specific injuries, and explained them
in order, it is not reasonably likely the jury misunderstood which
injuries related to which count of child abuse.

¶23   Given that each count was explicitly tied to specific
injuries in the Information read to the jury and in the State's
closing argument, it is unlikely the jury was confused by the
multiple child abuse charges and we see no reasonable
likelihood the jury would have returned a more favorable
verdict had the separate unanimity jury instruction been
requested and given.

¶24   Kitzmiller argues that even if the jury was able to discern
which injuries related to each count of child abuse, the alleged
error was harmful because the jury instructions did not clarify to
the jury that it must agree as to which of the two or more actions
listed in the Information supported the final count of child abuse
(Count IV). That count alleged Kitzmiller had "caused multiple
injuries, including bruises/abrasions to [Baby's] hands, ear, chest,
flanks, upper arms, and chin."

¶25   But we are not convinced the jury was confused here,
either. The definition of "serious physical injury" given in the
jury instructions included "any combination of two or more
physical injuries inflicted by the same person, either at the same
time or on different occasions." *See also* Utah Code Ann. § 76-5-
109(1)(f)(ii)(E) (LexisNexis 2017). Likewise, the prosecutor
explained that the last count of child abuse "lumped together"
many injuries because the definition of serious physical injury
relied on for Count IV required there to be "two or more
injuries." Thus, because the jury was aware that Count IV

required two injuries and it was generally instructed that "every single juror must agree with the verdict," we think it unlikely that the jury thought it did not have to agree on which "two or more injuries" supported the charge.

¶26 Furthermore, we recognize the importance of the strength of the State's case on Count IV. The child abuse pediatrician acknowledged that the actions Girlfriend reported, or others like them, could have caused several of the injuries listed in Count IV. For example, the pediatrician testified that shaking could have caused some of the bruising, that a caregiver's bites could have caused the abrasions on Baby's hands, and that placing Baby face down on the carpet could have caused his chin injury. The evidence in support of Count IV was strong, which also makes it less likely that any error in instruction on this count was prejudicial to Kitzmiller. *See State v. Alires*, 2019 UT App 206, ¶ 27, 455 P.3d 636 ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (quotation simplified)).

¶27 In sum, because we are not convinced the jury was confused regarding which injuries related to which counts, because it seems unlikely there was confusion regarding the unanimity required for each count, and because of the strength of the evidence supporting Count IV, we do not see a reasonable likelihood that the result would have been more favorable to Kitzmiller if the separate unanimity instruction had been requested and given. Thus, Kitzmiller has failed to show prejudice, and these claims of plain error and ineffective assistance of counsel therefore necessarily fail.

## II. In-Custody Informant Jury Instruction

¶28 Kitzmiller argues that the district court erred by refusing to give the in-custody informant jury instruction he proposed regarding Girlfriend's trial testimony. Trial counsel argued that

Girlfriend was an in-custody informant and, because of this, proposed instructing the jury to examine and weigh the testimony of such an informant "with greater care than the testimony of an ordinary witness." But the court determined that the in-custody instruction did not apply to Girlfriend because she was Kitzmiller's codefendant and "a person who had first-hand knowledge of the facts at issue," whereas the case referred to by the related model jury instruction was not such a situation, *see State v. Charles*, 2011 UT App 291, ¶¶ 15, 40–41, 263 P.3d 469 (considering an in-custody informant instruction where the informant was incarcerated with the defendant and testified about details the defendant had told him regarding the murder for which the defendant was charged).

¶29 "Failure to give requested jury instructions constitutes reversible error only if their omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Van Oostendorp*, 2017 UT App 85, ¶ 12, 397 P.3d 877 (quotation simplified). So even assuming, without deciding, that the proposed instruction would have been appropriate and that the district court erred by not instructing the jury as requested, we will not reverse where prejudice has not been shown and the jury was appropriately advised on the law. *See id.*

¶30 Kitzmiller's requested instruction stated, "[T]he testimony of an informant who provides evidence against a defendant must be examined and weighed by you with greater care than the testimony of an ordinary witness." It further provided the following factors for the jury to consider:

> 1. Whether the informant has received anything (including leniency in prosecution, personal advantage, or vindication) in exchange for testimony;

2. Other cases, and the number of other cases, in which the informant testified or offered statements against another, whether those statements are being used, and whether the informant received any deal, promise, inducement, or benefit in exchange for that testimony or statement, or believed he was likely to receive some benefit from his cooperation;

3. Whether the informant has ever changed her testimony;

4. The criminal history of the informant, not just limited to number of convictions, but also the level of sophistication gained through the informant's experience in the criminal justice system; and

5. Any other evidence related to the informant's credibility.

But where there was no evidence in the record that Girlfriend had testified in any other cases (the second factor) or gained any experience with the criminal justice system beyond the facts of this case (the fourth factor), some factors of the proposed instruction would have had no impact on the jury's evaluation of Girlfriend's testimony. Indeed, the inclusion of such factors in the instructions may even have been confusing for the jury.

¶31 Each of the remaining factors of the proposed instruction—the factors that arguably *were* applicable in this case—were included in the more general witness credibility instruction given to the jury. That instruction listed several factors to consider in evaluating witness credibility, including the following: "Does the witness have something to gain or lose from this case?", "Does the witness have any reason to lie or slant the testimony?", and "Was the witness's testimony consistent over time?" Thus, the credibility instruction that was

given urged the jury to consider all the applicable factors of Kitzmiller's requested instruction.

¶32    Kitzmiller's requested instruction also stated that an informant's testimony must be weighed with greater care and elaborated that this need for care was because "a witness who has entered into . . . an agreement with the government may have an interest in the case different than an[] ordinary witness." But where the jury was made aware of Girlfriend's plea agreement, where the jury heard Girlfriend admit she was hoping to get probation in exchange for cooperating with the State, where the court clarified that trial counsel was free "to argue any of the factors with regard to impeachment," and where trial counsel had pointedly argued to the jury the negative implications of the plea arrangement on Girlfriend's credibility, we are convinced the jury was aware of Girlfriend's apparent self-interest in testifying against Kitzmiller. And that awareness would have led to a more critical evaluation of Girlfriend's testimony under the witness credibility factors that were before the jury—resulting in a more careful scrutiny of Girlfriend's testimony than that of the other witnesses who had relatively little to gain or lose from testifying in the case. Under these facts, we conclude there is no reasonable likelihood of a more favorable result for Kitzmiller had his requested jury instruction been given.

¶33    As an alternative argument on this issue, Kitzmiller contends that trial counsel should have provided additional legal argument to the district court. Specifically, he argues that when the court indicated that it was not convinced to use an in-custody informant instruction and asked counsel for additional support, counsel should have switched tack and requested an instruction on accomplice testimony as addressed in Utah Code section 77-17-7.

¶34    But as we explained above, *see supra* ¶¶ 19–20, to prevail on an ineffective assistance of counsel claim, Kitzmiller must show both that trial counsel's performance was deficient and that such performance prejudiced his case; that is, he must show that the result would have been different but for counsel's error. Even assuming that the failure Kitzmiller highlights constitutes deficient performance, his claim fails because he has not established prejudice.

¶35    First, the statute on which Kitzmiller relies would only require the court to give an accomplice testimony instruction in certain cases:

> (1)    A conviction may be had on the uncorroborated testimony of an accomplice.
>
> (2)    In the discretion of the court, an instruction to the jury may be given to the effect that such uncorroborated testimony should be viewed with caution, and *such an instruction shall be given* if the trial judge finds the testimony of the accomplice to be self contradictory, uncertain or improbable.

Utah Code Ann. § 77-17-7 (LexisNexis 2017) (emphasis added). And Kitzmiller has not shown that the court likely would have determined Girlfriend's testimony was "self contradictory, uncertain or improbable," thus requiring the accomplice testimony instruction. *See id.* And second, even if such an instruction were given, we are not convinced there is a reasonable probability that the result of his trial would have been different. As discussed above, where the general witness credibility jury instruction already encouraged the jury to consider what each witness would gain from testifying, whether each witness had any reason to lie, and whether a witness's testimony was consistent, and where trial counsel successfully alerted the jury to Girlfriend's self-interest in testifying, we are not convinced there is a reasonable likelihood that the result

would have been more favorable to Kitzmiller if an accomplice testimony instruction had been given. *See State v. Dunn*, 850 P.2d 1201, 1226–28 (Utah 1993) (finding no prejudice from a trial attorney's failure to request an accomplice testimony jury instruction under section 77-17-7 when the jury was aware of the accomplice's plea arrangement and his concomitant "motive to tailor his testimony to favor the prosecution," as well as the accomplice's general "propensity to lie," and when the jury was instructed to consider self-interest and motive in assessing witness credibility), *abrogated on other grounds by State v. Silva*, 2019 UT 36, 456 P.3d 718. Thus, under these facts, Kitzmiller has not established prejudice.[4]

### III. Sufficiency of the Evidence

¶36    Kitzmiller argues the evidence was insufficient to support the jury's guilty verdicts on Counts II and IV. Although he concedes the evidence established that Baby's injuries were not accidental and that someone abused Baby, he argues there was

---

4. Kitzmiller also makes a cumulative error argument, asserting that even if the two jury instruction errors are not prejudicial on their own, when taken together they undermine confidence in the fairness of his trial. We will reverse under the cumulative error doctrine only if "(1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines [our] confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. Even assuming that the alleged errors carried a "conceivable potential for harm," *see id.*, their combined effect is not such that it "undermines our confidence that a fair trial was had," *see State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (quotation simplified). Thus, Kitzmiller's cumulative error argument is unavailing.

"no evidence" about who caused the injuries and therefore "the jury necessarily engaged in speculation to reach its conclusions."

¶37 For each of the child abuse charges, the State was required to prove beyond a reasonable doubt that Kitzmiller "intentionally or knowingly" inflicted a "serious physical injury" on Baby.[5] *See* Utah Code Ann. § 76-5-109(2), (2)(a) (LexisNexis 2017). For Count II, the serious physical injury was Baby's broken arm; and for Count IV, the serious physical injury was two or more of the lesser injuries. *See id.* § 76-5-109(1)(f)(ii) (specifying that the term "[s]erious physical injury" includes, among other things, a "fracture of any bone" or "any combination of two or more physical injuries inflicted by the same person, either at the same time or on different occasions").

¶38 As an initial matter, we note that our analysis must consider more than the direct evidence presented at trial: "Direct evidence is not required. Sustainable verdicts are entered every day on the sole basis of circumstantial evidence. And where the jury returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict." *State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645 (quotation simplified). It is also important to distinguish between inferences, which are permissible support for a guilty verdict, and mere speculation, which Kitzmiller argues underlies the verdict here. "An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. On the other hand, speculation is the

---

5. Although these charges also could have been supported by a showing that Kitzmiller caused or allowed another individual to inflict serious physical injury on Baby while Baby was in his care, *see* Utah Code Ann. § 76-5-109(2) (LexisNexis 2017), the State did not pursue this theory at trial, and we do not consider it in our analysis.

act or practice of theorizing about matters over which there is no certain knowledge at hand." *State v. Prisbrey*, 2020 UT App 172, ¶ 23, 479 P.3d 1126 (quotation simplified). Thus, "the difference between an inference and speculation depends on whether the underlying facts support the conclusion." *Id.* (quotation simplified).

¶39 Furthermore, as outlined above, *see supra* ¶ 17, our review on this issue must take into account the evidence and reasonable inferences in the light most favorable to the jury verdict, *see State v. Hamilton*, 827 P.2d 232, 236 (Utah 1992). And we must assume the jury believed the evidence that supports the verdict. *State v. Widdison*, 2001 UT 60, ¶ 74, 28 P.3d 1278. Therefore, we will overturn the verdict only if the evidence "is so insufficient that reasonable minds could not have reached the verdict." *Id.* (quotation simplified).

¶40 Much of the underlying evidence, if believed, supported the jury's verdict here. First, Girlfriend's testimony was not simply that Kitzmiller sometimes was careless in handling Baby; instead, she testified that he was often angry with Baby and she observed several instances of inappropriate handling that she worried would harm Baby. Among these was Kitzmiller tossing Baby between his hands and into the air as well as an episode in which Kitzmiller held Baby by the shoulders and angrily shook him. Second, the child abuse pediatrician testified that those types of actions could have been related to the injuries referred to in Count II and Count IV. She testified that Baby's broken arm (addressed in Count II) would have been caused by some "spiral-type grab" such as a "twisting mechanism or yanking" because it was an "oblique" fracture, going "diagonally across the bone." She said that this could have been caused by tossing Baby into the air and then catching him by the arm. The pediatrician also testified that some of Kitzmiller's actions, as reported by Girlfriend, could have caused several of the lesser injuries addressed in Count IV. *See supra* ¶ 26. Third, there was

evidence that the bloody clothing recovered from the hamper was Baby's clothing and men's clothing.[6] Fourth, several pieces of evidence touched on Kitzmiller's reactions to the events at issue. Girlfriend reported Kitzmiller dissuaded her from seeking medical attention for Baby because Baby might be removed from her care. Several police officers responding on the night Baby died reported that Kitzmiller was nervous, panicky, angry, or defensive. And Girlfriend testified that after Baby's death, Kitzmiller said he thought Baby's death was his fault.

¶41   This underlying evidence could have sustained a reasonable inference that Kitzmiller intentionally or knowingly caused Baby's broken arm and two or more of his more minor injuries. Thus, sufficient evidence supports the jury's verdict on these counts and we will not overturn Kitzmiller's convictions on sufficiency grounds.

CONCLUSION

¶42   Kitzmiller has failed to show prejudice arising from the lack of a separate unanimity instruction. He has also failed to show prejudice regarding the court's refusal to give his requested in-custody informant instruction or his counsel's failure to present a more persuasive argument on this issue. And we are unconvinced the trial evidence is insufficient to support his child abuse convictions. Therefore, we affirm.

───────────

6. Kitzmiller argues evidence of the bloody clothing should not be considered because the State presented no evidence concerning whose blood this was or where the blood would have come from. Although he cites no authority supporting this position, we note that our reliance on this evidence is minimal and our decision would be the same even without considering it.