The STATE of Utah, Plaintiff and Respondent,

v.

Richard Hatfield NICKLES and Margaret K. Nickles, Defendants and Appellants.

No. 19221.

Supreme Court of Utah.

Oct. 7, 1986.

Rehearing Denied Nov. 23, 1986.

---

Curtis Nesset, Salt Lake City, for defendants and appellants.

David L. Wilkinson, Dave B. Thompson, Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

Defendants Richard Hatfield Nickles and Margaret K. Nickles appeal their convictions of aggravated arson and insurance fraud.

In the early morning hours of October 30, 1980, while defendants and their two daughters, Kimberly and Diane, were on a trip to California, an explosion and fire occurred at their home in Salt Lake County. An investigation by the Salt Lake County Fire Department and Arson Task Force (ATF) uncovered evidence of arson. Defendants were subsequently charged with aggravated arson and insurance fraud, both second degree felonies, under U.C.A., 1953, § 76–6–103 (1978) and § 76–

6–521 (1978), respectively. They were found guilty as charged. Mr. Nickles was sentenced to two concurrent sentences of one to fifteen years in the Utah State Prison. Mrs. Nickles was given an identical sentence, but the court placed her on probation. Both were ordered to pay fines as well as restitution.

## I.

■ Defendants first contend that there was insufficient evidence to support the verdict of the jury. Our standard of review in this regard is well established; we review the evidence and the inferences to be drawn therefrom in the light most favorable to the jury verdict. *State v. Dumas*, 721 P.2d 502 (Utah 1986); *State v. McCardell*, 652 P.2d 942 (Utah 1982).

### Cause of Fire

Defendants maintain that reasonable doubt exists, as a matter of law, whether the explosion and fire were arson caused, and that even if they were, whether defendants are the guilty parties. To prevail on this contention, defendants must show that the evidence was so insubstantial or inclusive that reasonable minds must have entertained a reasonable doubt that they committed the crime charged. *State v. Dyer*, 671 P.2d 142 (Utah 1983). Section 76–6–103 (1978), in effect at the time they were charged, provides that "[a] person is guilty of aggravated arson if by means of fire or explosives he intentionally and unlawfully damages ... a habitable structure." The record reflects the evidence of an arson-caused explosion and fire.

In June of 1980, several months before the fire, the fire marshall and captain of the Murray City Fire Department was asked by Mr. Nickles to visit Composter Corporation, a business operated by defendants. Mr. Nickles expressed his concern that the operators of an adjacent boat manufacturing business, who were experiencing financial problems, might attempt to burn down their building. In response to his question about what products the boat manufacturers might have in their posses-

sion to set fires, the fire marshall told Nickles that liquid acetone could be used. Although he made at least five subsequent visits to Mr. Nickles at Composter Corporation during July and August, he testified that he had not seen signs of an ongoing business at Composter on any visit.

Several weeks later, on August 13, 1980, Composter Corporation borrowed $75,000 from Capital Thrift & Loan. The note was signed by defendants individually and by Mr. Nickles as president of the corporation. Their home was mortgaged as security for the loan, and according to defendants, the loan was to be paid out of the proceeds from its expected sale.

Defendants' home had been on the market at various times during 1980, and at the time of the fire was listed with one Alice Blair, a real estate agent, who had listed the home on October 3, 1980, for $239,000. She testified that she had not shown the home nor did she have any potential buyers, and that defendants had refused to give her a key, claiming that a complex burglar alarm system had been installed. Blair had also been unable to schedule an open house, even on a weekend defendants were going to be out of town, despite her repeated efforts to do so.

Defendants' home was covered by a "cadillac" insurance policy which was increased from $165,000 to $250,000 in January of 1980. This increase, made at their request, was to cover the refurbishing of their home. In early October of 1980, Mrs. Nickles secured a "rider" for silverware in the amount of $17,280 which became effective on October 10, 1980. Before the date of the fire on October 30th, Mrs. Nickles, her daughters and the family's two dogs left for California. Mr. Nickles planned to fly to Los Angeles for business meetings and then join his family in Santa Maria.

On the evening of October 28, Mr. Nickles telephoned a neighbor, Linda Dickert, and told her that he had a casserole he wanted to give her because he was leaving town at noon the next day. Dickert's fourteen-year-old son, David, went over to pick up the casserole and found it sitting out-

side on a flower box. He did not go inside the house. He noticed that one of defendants' cars was backed up in the driveway with the trunk opened, approximately ten feet from the door. Several days earlier, Mrs. Nickles had asked David to care for their cat while they were away. She had on previous occasions given the Dickerts the key to the house; this time, however, she placed the cat's food and bowls on the porch outside the front door.

As Dickert was getting ready to go to bed, about 3:00 a.m. on October 29th, she noticed that lights were on in nearly every room of defendants' house. She did not notice any movement or activity. At the trial, she testified that she had heard defendants talk about acetone in connection with their business, that she had seen a gallon container of acetone in their home, and that Mrs. Nickles had offered to lend her some acetone, claiming that she had it by the "barrelful."

Mr. Nickles was in California with his family at the time he received a call informing him of the explosion and fire. They returned to Salt Lake City on November 2, three days later. In an interview with a special agent for ATF and the Salt Lake County Special Arson Fire Enforcement Unit, Mr. Nickles stated that he had left for California on Wednesday, October 29, at 11:50 a.m. He indicated that only two families knew of his travel plans and that no one had been given a key to the house. He also stated that certain valuables had been removed from the house due to concerns about a possible burglary. Birth certificates and personal papers had also been removed from the house vault and sterling silver had been placed in the vault for safekeeping. During that interview, Mr. Nickles inquired as to whether a timing device had been found. Fire investigators testified that they had observed evidence of a flammable liquid explosion, multiple points of fire origin, "pour patterns," and "puddle" areas indicative of fire origin. A device consisting of a light bulb embedded in a large amount of newspaper ash with an electrical wire running from the base of the light bulb socket to an electrical outlet in the wall was found on the floor of defendants' daughter, Kimberly's basement bedroom. Also found were "trailers" leading out of her bedroom into the hallway. The window and its frame in Kimberly's bedroom were blown out. Investigators found several acetone soaked suitcases under the stairway in the basement.

Expert testimony at trial disclosed that the pour patterns in the house, coupled with the melted steel on a glass door, indicated that flammable liquid had been poured on the floor of the house before the fire. Experts also testified that the explosion was not consistent with a natural gas explosion, and was not likely caused by swamp gas. Finally, experts testified that a "wet-type" explosion associated with flammable liquids produced "instant fire," and identified the device found as one commonly used by arsonists to ignite fires.

The explosion hurled glass onto roofs and into yards of nearby houses. Windows were blown out in a neighbor's house, and the house directly south of defendants' was singed by flames. Firemen arrived within minutes of being summoned to fight the fire. When they arrived the home was engulfed in flames. The fire was very hot and difficult to extinguish.

The foregoing facts presented substantial evidence which established, beyond a reasonable doubt, that the fire had been caused by arson.

### Guilt of Defendants

Inasmuch as the jury believed that the fire had been arson caused, it is reasonable that it would also find from that same evidence that defendants committed the arson. Although the evidence connecting defendants to the crime is primarily circumstantial, it is a well-settled rule that circumstantial evidence alone may be sufficient to establish the guilt of the accused. *State v. Clayton*, 646 P.2d 723 (Utah 1982); *State v. Franks*, 649 P.2d 3 (Utah 1982); *State v. Paradis*, 106 Idaho 117, 676 P.2d 31, *cert. denied*, 468 U.S. 1220, 104 Sup.Ct. 3592, 82 L.Ed.2d 888 (1983); *People v. Pierce*, 24

Cal.3d 199, 155 Cal.Rptr. 657, 595 P.2d 91 (1979); *State v. Brady*, 2 Ariz.App. 210, 407 P.2d 399 (1965). Circumstantial evidence need not be regarded as inferior evidence if it is of such quality and quantity as to justify a jury in determining guilt beyond a reasonable doubt, and is sufficient to sustain a conviction. *State v. Weaver*, 637 P.2d 23 (Mont.1981).

The jury could reasonably infer the following facts from the circumstantial evidence presented at trial: the defendants were in serious financial trouble and made plans to burn down their house to solve their problem; that they increased the insurance on their house so they would receive more money from the policy; that Mrs. Nickles refused to give the realtor a key because she wanted to assist Mr. Nickles in setting the house up for the fire; that she had lied about the burglar alarm system because she planned to claim it on the proof-of-loss statement; that Mr. Nickles put the casserole outside because he did not want the neighbor's son in his house to observe the fire preparations; that Mrs. Nickles put the cat's food out on the porch and did not give the neighbor's son the key because she did not want the cat to be inside when the fire started; that she took the family dogs with her to California for the same reason; that the lights were on at 3:00 a.m. because Mr. Nickles was setting the fire; and finally, that defendants took their time returning from California because they were not shocked or surprised by news of the fire.

If the jury concluded that each defendant, either directly committed the defense or aided in its commission, the verdict must be sustained. The jury had before it considerable circumstantial evidence from which it could have concluded that defendants committed arson, either directly in the case of Mr. Nickles, or indirectly by aiding and assisting, in the case of Mrs. Nickles.

### *Insurance Fraud*

■ Defendants also contend that there was insufficient evidence to support the jury's verdict finding them guilty of insur-

ance fraud. On December 30, 1980, two months after the fire, defendants submitted a proof-of-loss statement to their insurance carrier. The statement listed approximately 1700 items and claimed $233,-353.29 for the house, $134,000 for contents, $53,600 for loss of use, $12,876 for silver, $3,800 for furs, $6,500 for landscape, and $360 for other structures.

Insurance adjusters assigned to the case testified that numerous items of the greatest value were not found in the remains of the fire, and that, at best, only 50% of the items claimed by defendants in their proof-of-loss statement were located. Investigators with the Salt Lake County Attorney's Office were unable to verify purchases of several major items, including the sterling silver purportedly purchased at ZCMI, and other items allegedly purchased by defendants and claimed in their proof-of-loss statement.

Defendants assert that their submission of an insurance claim which may have included inaccurate estimates of value does not alone constitute fraud. We concede that it does not; however, under U.C.A., 1953, § 76–6–521, we note that the jury, without addressing the accuracy of the submitted estimates, could easily find that defendants did commit insurance fraud. Section 76–6–521 provides:

> Every person who presents, or causes to be presented, any false or fraudulent claim, or any proof in support of any such claim, upon any contract of insurance for the payment of any loss, or who prepares, makes or subscribes any amount, certificate of survey, affidavit or proof of loss, or other book, paper or writing, with intent to present or use the same, or to allow it to be presented or used, in support of any such claim is punishable as in the manner prescribed for theft of property of like value.

The plans submitted to the insurance company for reconstruction of defendants' house included, among other things, an intercom system and a burglar alarm system, neither of which had been in the home prior to the fire. In fact, at the trial, Mrs.

Nickles testified that the house did not have a burglar alarm system or an intercom system. From the evidence presented at trial, it is clear that defendants, despite the difficult conditions under which they were required to prepare their proof-of-loss statement, presented a "false or fraudulent claim" to their insurance company. Even if the jury had chosen to disbelieve the testimony of fire investigators as to items they were unable to locate or identify in the rubble, the undisputed evidence that defendants claimed a nonexistent burglar alarm system and intercom system on their proof-of-loss statement is sufficient evidence to support the verdict finding defendants guilty of insurance fraud. A determination of whether their claim was excessive on other items is unnecessary inasmuch as the defendants did submit a fraudulent claim intentionally misrepresenting the existence of these two items. *See State v. Kitchen,* 564 P.2d 760, 763 (Utah 1977).

## II.

■■■ Defendants next contend that evidence of a telephone call received by an employee of ATF approximately three weeks after the fire, from a caller purporting to be Mr. Nickles, was inadmissible because there was no authentication or identification of the caller. It is well established that communications by telephone are admissible in evidence where otherwise relevant to the facts and issue. 29 Am. Jur.2d *Evidence* § 380 (and cases cited therein). The identity of a caller may be established by circumstantial evidence. *United States v. Brown,* 603 F.2d 1022 (1979); *Grogan v. United States,* 394 F.2d 287 (5th Cir.1967); *State v. Peele,* 54 N.C. App. 247, 282 S.E.2d 578 (1981). Further, if the party calling, in addition to a statement of his identity, relates facts and circumstances which, taken with other established facts, tends to reveal his identity, the conversation is admissible. *State v. Marler,* 94 Idaho 803, 498 P.2d 1276 (1972); 29 Am.Jur.2d *Evidence* § 384. Here, both requirements were satisfied. At the trial, the following testimony was given by Elaine Rice, a secretary for ATF:

Q: At the time that you received the call from the person calling, did the person calling identify himself?

A: He identified himself to be himself a Dick Nickles, yes.

Q: Yes.

. . . .

Q: Did the person purporting to be Mr. Nickles have any further conversation with you?

A: Yes.

. . . .

Q: If you would, to the best of your recollection, describe or state what the person purporting to be Mr. Nickles or Mr. Dick Nickles stated to you during the course of the conversation. . . .

A: He was asking about some articles that had been removed from his home and then mentioned to me that there had been a suspected arson at his home and that he had been suspect[ed] of it and commented that wasn't it lucky he had been 800 miles away with the Secretary of the Department of Energy and that he would have needed a very long fuse or a time delay.

Then, he again came back to the fact that these articles were missing and I asked what was missing and he said some silverware and other things, whole drawers full. And I told him I didn't believe we had them and that he said possibly they had been removed for safekeeping.

I told him that I didn't think we had them, but that I would have [the investigator] call when he got back to the office.

If we examine this conversation in light of the principles stated above, it is clear that the testimony of Eileen Rice reveals that the caller identified himself as Mr. Nickles. Further, he offered information to the employee that only he or someone in his family would have known. Although certain information pertaining to the fire had been made public by the media, there is nothing in the record to controvert the logical inferences to be drawn from this infor-

mation, i.e., that the caller was in fact Mr. Nickles. Defendants rely on *State v. Marler, supra,* to support their contention that the lower court should not have admitted the telephone call into evidence. We find their reliance to be misplaced. Although the court in that case determined that a "mere statement of his identity by the caller is insufficient proof of the caller's identity," it also acknowledged that corroboration of a statement of identity by the caller sufficient to render the conversation admissible against him may be supplied by evidence "that the *subject matter* of the call revealed that only the named party would likely have knowledge of those conversational facts," or "of other confirming circumstances which make it probable that the named person was, in fact, the speaker." *Id.* at 1281 (citations omitted; emphasis added).

In *State v. Hamilton,* 185 Mont. 522, 605 P.2d 1121 (1980), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3017, 65 L.Ed.2d 1117, the Montana Supreme Court noted:

> The completeness of the identification goes to the weight of the evidence rather than to its admissibility, and the responsibility lies in the first instance with the District Court to determine within its sound discretion whether the threshold of admissibility has been met.

*Id.* at 1128 (citation omitted). We find no abuse of discretion here, and find that the lower court properly admitted testimony of the phone call into evidence.

### III.

■ Defendants' third contention is that they were denied their right to a fair trial due to the individual and cumulative effect of evidence which they claim was inadmissible because it was irrelevant or immaterial. Rule 401,[1] Utah R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination

of the action more probable or less probable than it would be without the evidence." At the trial, defense counsel objected, among other things, to the admission of the neighbor's testimony concerning the lights being on in defendants' home in the early morning hours of October 29, as well as evidence pertaining to other accellerants, the amount of insurance coverage on the property, and the proximity of defendants' business to a thrift store.

We cannot find that the lower court abused its discretion by admitting this evidence. Even if some of these admissions had been error, in light of the other evidence presented at trial, it would be harmless error in that there is no reasonable likelihood in the absence of this evidence there would have been a different result in defendants' trial. *See State v. Hutchison,* 655 P.2d 635 (Utah 1982).

### IV.

■ Defendants next contend that the trial court failed to properly instruct the jury on the elements of insurance fraud by refusing to give their requested Instruction No. 14. That instruction included, as an element to be proved for conviction of the crime of insurance fraud, that the jury must find that defendants submitted values for items on their proof-of-loss statement which were intentionally excessive, not just merely inaccurate estimates of value. They claim that this deficiency may have confused the jury to the extent that it reached a guilty verdict without sufficient evidence of criminal conduct. We find this contention to be without merit. The court's Instruction No. 21 adequately differentiates between intentional fraud and reasonable error in the submissions of estimates of value. That instruction reads:

> You are instructed that an act committed or an omission made under ignorance or a mistake of fact which disproves any

---

1. This Rule is comparable in substance to former Rule 1(2), Utah R.Evid. (1971); the former Rule, in effect at the trial in this action, defines "relevant evidence" as that having a tendency to prove or disprove the existence of any "material fact." The application of former Rule 1(2) by this Court in *State v. Peterson,* 560 P.2d 1387 (Utah 1977), is harmonious with the new language.

criminal intent is not a crime. Thus a person is not guilty of a crime if he acts under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such an act or an omission lawful. *If you find that the defendants, or either one, because of a reasonable mistake, made certain claims upon an insurance company believing such claims to be true to the best of his knowledge, then you must find him not guilty of insurance fraud.*

(Emphasis added.) As we noted above, defendants' intention to submit a fraudulent claim is clear from the undisputed evidence that they claimed a nonexistent burglar alarm system and intercom system. Thus, the court properly instructed the jury on the elements of insurance fraud.

## V.

█ Defendants' final contention is that they are entitled to a new trial because there was a conflict of interest on the part of the deputy county attorney assigned to prosecute this case. Earlier, we remanded this case to the trial court for supplemental proceedings on the issue of prosecutorial misconduct. Defendants moved the court for a new trial based on the evidence presented at that hearing. The trial court denied their motion, finding among other things, that "the case was tried and conviction[s] obtained upon evidence and facts developed and found upon investigation of the Salt Lake County Fire Department and not AFI."

The prosecutor had been employed by the Salt Lake County Attorney's Office since 1976. In 1979, he began prosecuting arson and insurance fraud cases, and received training in arson and insurance fraud investigation from the National Fire Academy. In June or July of 1980, the Salt Lake County Attorney's Office was a recipient of a federal grant to establish a countywide arson task force, and he became the lead prosecutor for that group (ATF). The full task force investigated the fire at defendants' home. He, along with other task force personnel, reviewed this case for possible criminal charges.

The fire at defendants' home occurred October 30, 1980. In late March of 1981, approximately five months later, the prosecutor along with his wife and one other individual formed a private corporation called Arson and Fraud Investigation (AFI) which was designed to provide jobs in arson investigation for the several employees of the County Attorney's Arson Task Force who had been notified that their positions would terminate as of July 1, 1981. AFI performed eight investigations in Idaho, Wyoming, and Utah, and he personally participated in many of these investigations. He did not advise the Salt Lake County Attorney about the incorporation of AFI. In June of 1981, when the Salt Lake County Attorney became aware of its existence, he asked the prosecutor to disassociate himself from the business. AFI terminated its business operations by September of 1981 and filed Articles of Dissolution on December 8, 1982. Thus, the prosecutor had been uninvolved in the operations of AFI for approximately one year by the time defendants were brought to trial in June of 1982.

U.C.A., 1953, § 67–16–4(4), provides that "no public officer or public employee shall ... [a]ccept other employment which he might expect would impair his independence of judgment in the performance of his public duties." A public prosecutor who is involved with a corporation that investigates possible arson and insurance fraud cases for insurance companies should not also be representing the state in the prosecution of similar cases. This would appear to be a conflict of interest. The pivotal issue here, however, becomes whether in this instance, defendants were entitled to a new trial because of an *apparent* conflict of interest.

The State cites *Wright v. United States,* 732 F.2d 1048 (2d Cir.1984), where the Court of Appeals advocated a scaled approach to the review of prosecutorial conflict of interest claims. Specifically, it stated that:

[T]he degree of prosecutorial misconduct ... and the degree of prejudice to the defendant necessary to justify action by a reviewing court steadily increase as the case goes forward, with the least being required on a motion to disqualify, somewhat more on a pretrial motion to dismiss an indictment, still more on a motion in the district court after conviction but before appeal, [and] somewhat more on a direct appeal....

*Id.* at 1056 n. 8.

It is clear that a prosecutor should be disqualified on a timely motion when he has a personal conflicting interest in a case. Here, however, defendants failed to move in the trial court to disqualify the prosecutor and only now, on appeal, assert a denial of due process and equal protection. In these circumstances, we must require that defendants prove actual prejudice. *United States v. Heldt,* 668 F.2d 1238, 1277 (D.C. Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Defendants have made no showing of actual prejudice. To the extent that defendants might receive relief from the prosecution solely on a showing of potential prejudice, they would become the undeserving beneficiaries of a rule that attempts to promote the public good. As we noted above, the business of AFI terminated its operations in September of 1981; defendants were not brought to trial until June of 1982. Any conflict the prosecutor had between AFI and defendants' case had been severed long prior to the trial. All work performed by him on this case from the time of the fire in October of 1980 until June of 1981, when he discontinued his association with AFI, was performed in his capacity as Deputy County Attorney. AFI played no part in the investigation. Defendants correctly note that the same prosecutor's misconduct caused reversal of an earlier arson conviction by this Court in *State v. Troy,* 688 P.2d 483 (Utah 1984). However, the facts requiring reversal in that case, i.e., the inappropriate comments made by the prosecutor during opening and closing statements, are not analogous to the conflict of interest issue presented here. Absent a

showing of actual prejudice which the defendants were unable to make, we find no error which would justify a new trial, and the lower court properly denied their motion.

Convictions affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.