2020 UT App 172

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
CLARE EUGENE PRISBREY,
Appellee.

Opinion
No. 20190569-CA
Filed December 24, 2020

Fifth District Court, Iron County Department
The Honorable Keith C. Barnes
No.181500247

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellant

Gary W. Pendleton, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE DAVID N. MORTENSEN concurred. JUDGE JILL M. POHLMAN
dissented, with opinion.

HARRIS, Judge:

¶1    One New Year's Eve, Clare Eugene Prisbrey's house caught fire. It took firefighters more than an hour to get the fire under control, and the house sustained severe damage. After examining the scene that night and the next day, fire officials came to suspect that Prisbrey had set the blaze intentionally, and the State later charged him with aggravated arson and filing a false insurance claim. At a preliminary hearing, however, the magistrate found no probable cause that Prisbrey had committed those crimes, and declined to bind the case over for trial. The State appeals that determination, and we affirm.

BACKGROUND[1]

¶2    On December 31, 2017, Prisbrey and his girlfriend (Girlfriend) were together at Prisbrey's house, celebrating the holiday. A few weeks earlier, Prisbrey had decorated his living room (the great room) with Christmas decorations, including a miniature Christmas village—a collection of decorative ceramic houses arranged on foam blocks, wood, and synthetic snow—set up on a table against the wall. Around 9:30 that evening, Prisbrey lit several candles in the Christmas village display and, later, around 10:00 p.m., he and Girlfriend opened a bottle of sparkling grape juice and watched New Year's Eve fireworks displays happening in "different time zones."

¶3    A few minutes later, Prisbrey and Girlfriend left the house; Prisbrey explained to fire officials that he had made a "last minute" decision to propose marriage to Girlfriend that evening, and wanted to do so on the grounds of the local temple of the Church of Jesus Christ of Latter-day Saints. So, a few minutes after 10:00 p.m., Prisbrey, Girlfriend, and Prisbrey's dog got into Prisbrey's car and made the short drive to the temple. No one remained in Prisbrey's house. Before leaving the house for the proposal, however, Prisbrey did not extinguish the six candles in the Christmas village display. Girlfriend testified that she and Prisbrey, in the moment, did not think about it, and merely forgot. The State takes a different view.

¶4    Just as Prisbrey and Girlfriend arrived at the temple and pulled into a parking spot, Prisbrey received a phone call from one of his neighbors informing him that his house was on fire. Someone called the fire department at 10:22 p.m. and the local

---

1. When we review a "magistrate's bindover decision, we view all evidence in the light most favorable to the prosecution, draw all reasonable inferences in favor of the prosecution, and recite the facts with that standard in mind." *State v. Nihells*, 2019 UT App 210, n.1, 457 P.3d 1121 (quotation simplified).

fire chief (Chief) arrived on scene at 10:29 p.m. Fire crews arrived at "about the same time" and began attempts to extinguish the fire. At that point, the fire was already "50 percent involved," with "fire showing from the roof and from the windows." Chief found that the fire was already "so intense" that he could not approach the house to turn off the gas and the power. Having been informed that there were no people or pets in the house, firefighters took "a defensive strategy," choosing to fight "the fire from the outside" instead of "going inside."

¶5 Firefighters began by deploying a "deck gun" from their fire truck, which dispenses between 500 and 1,000 gallons of water per minute. However, use of the deck gun "didn't seem to knock the fire down," so the fire crews used an "aerial apparatus" to fight the fire from above, and "that's when [they] started getting control" of the fire. In total, it took the fire crews "just over an hour" to get the blaze contained.

¶6 Once the fire was contained, Chief began inspecting the damaged remains of the house, and noticed some "red flags" that he thought might indicate that the fire had been intentionally set. First, he thought that "the [house] appeared to be sparsely furnished," in that "it just didn't seem to have the stuff that a regular [house] would have in it." Chief did not inventory the contents of the house, but simply developed this viewpoint from walking through the various rooms of the house after the fire. Another officer on the scene, whose identity Chief could not recall, told him that Prisbrey "had placed some stuff in a storage unit," but Chief did not follow up on the "storage unit" lead, or investigate the source of the other officer's statement or the extent to which it might be correct. Second, Chief noticed that "[t]here were some holes that were pushed through the wall" between the great room and the garage, about "a foot and a half off the floor," and he thought those holes might have been intended to facilitate the spread of the fire into the garage.

¶7 After noticing these things, Chief spoke with Prisbrey and asked him if he had any idea how the fire may have started.

Prisbrey told Chief that, about two weeks earlier, his dog had tracked paint through the house, and that within the previous couple of days Prisbrey had used paint thinner to spot-clean the dog's paint tracks. Not all paint thinners are flammable, and Chief did not ask Prisbrey what kind of paint thinner he used or specifically where he had used it. Nevertheless, this piece of information added to Chief's suspicions, and based on all of the information he had at the time, he made the decision to notify the office of the Utah State Fire Marshal to ask it to investigate. Chief made that notification by phone call at about 11:30 p.m. that night. He also decided to station a fire crew at the house overnight to make sure the scene remained undisturbed, until someone from the State Fire Marshal's office could arrive.

¶8   The following morning, New Year's Day 2018, a section manager from the State Fire Marshal's office (Marshal) arrived on the scene. Before entering the house, Marshal spoke with Prisbrey, who was sitting in his vehicle in front of the house. Prisbrey told Marshal about leaving the six candles lit in the Christmas village. When Marshal asked about flammable liquids in the house, Prisbrey informed Marshal that he had some camp fuel stored in a closet, and again recited the events that had occurred with his dog tracking paint into the house and cleaning it up "all over the place" with paint thinner. Like Chief, Marshal did not ask Prisbrey what kind of paint thinner he used or specifically where he had used it.

¶9   After interviewing Prisbrey, Marshal then inspected the house. He discovered "very heavy fire damage" in the great room near where the Christmas village display had been, and "very heavy" damage to the second floor of the house, such that it was unsafe for him to proceed up the stairs. Prisbrey also pointed out where his "overly dry" Christmas tree had been located. During his walk-through, Marshal saw signs that the fire may have spread quickly through the house, "more quickly than [he] would have expected."

¶10    When Marshal went into the garage—which shared a wall with the great room—he noticed that the garage was "significantly undamaged," either from fire or water damage. A water heater was located along the wall next to the great room, and right next to the water heater—within just a few inches—were stacked several one-gallon containers of gasoline, one of which had its top removed. Near the gas cans was a "plastic garbage can full of various aerosols and flammable liquids."

¶11    Perhaps most significantly, Marshal noticed, along the wall between the garage and the great room, "two holes in the wall" that were located very close to where the Christmas village display had been (on the great room side) and where the gas cans were (on the garage side). Marshal asked Chief and the local fire marshal whether the two holes had been created "during suppression" by high-pressure water hoses, and Chief and the local marshal stated that "they didn't make [the holes] with a water stream," and that if they had, there would have been extensive water damage in the garage and the items in the garage, including the gas cans, would have been moved around.[2] But Marshal did not ask any of the line firefighters

_____

2. The dissent states that Marshal posed only "a more general question," asking only "if the holes were made by the fire department's suppression, and the answer was no." *See infra* ¶ 46 note 9. But in our view, the evidence indicates otherwise. While Marshal, in his testimony, did describe his question in rather general terms, he then testified that the answer to his question was that crews "did not" make the hole "during suppression," and that the crews "said if they had, their water pressure from their hose streams would have likely knocked over everything on the other side of the great room and moved the gas cans and other things around and created more water damage in the garage, which we had very little of." And he later stated that Chief and the local fire marshal told him, in answer to his question, that "they didn't make those [holes] with a water stream." From context, then, it is clear that the question Marshal

(continued…)

whether the holes had been created after the fire had been controlled, when crews were searching the house for hot spots, and Marshal conceded on cross-examination that it was "[p]ossibl[e]" that the holes had been made by fire crews after the fire was under control.[3] When asked about the two holes, Prisbrey denied any knowledge of them, and Girlfriend testified that she had not noticed them when she was in the garage on New Year's Eve before leaving for the temple, although she acknowledged she had not been looking for them.

¶12 After his inspection of the garage, Marshal "believed [he] had uncovered elements of an arson," so he "backed out of the scene" and informed the officers on scene that they "would need a warrant to proceed any further." He testified that this was "the end of [his] investigation," and that, at that point, he "left the scene and never returned to the premises." However, the record contains no indication that a search warrant was ever sought or obtained, and no evidence of any further investigation of the incident by any governmental entity—whether by local law enforcement or by the office of the State Fire Marshal—was submitted to the magistrate at the preliminary hearing.

---

(…continued)
asked had to do with whether the holes were created by water streams during fire suppression efforts, and not whether the holes were created while looking for hot spots after the fire was already out.

3. The dissent contends that "[t]he only suggestion that the holes could have been made by the fire department in search of a hot spot came from defense counsel in cross examination of Chief." *See infra* ¶ 46 note 9. We view the record differently. As noted, the subject came up during Marshal's testimony as well, and although the question was posed by defense counsel, Marshal acknowledged in response that the holes could "[p]ossibly" have been made by fire crews after the fire had been controlled.

¶13  Despite conducting no further investigation, Marshal testified at the preliminary hearing that, in his opinion, "this was an arson." In response to a question about the basis for this opinion, Marshal testified as follows:

> The holes in the wall that weren't caused by fire department suppression streams, the gas cans up against the water heater, the candles on the other side of the garage wall in the great room that were left burning with combustible material around them, that was certainly some of my red flags as far as elements of an arson go.

Marshal acknowledged that he had not reached any conclusion that the house had been sparsely furnished, and was not basing his opinion on any such notion, and that his opinion was likewise not based on the presence of paint thinner (or any other accelerant) on the floor, even stating that he "wasn't concerned with accelerant being used" in the great room. Indeed, upon direct questioning from the magistrate, Marshal reaffirmed that his opinion was not based on the presence of accelerants, but was instead based on "the hole[s] in the walls, [the] location of the gas cans, as well as the lit candles."

¶14  Soon after the fire, Prisbrey notified his insurance company and submitted a claim, therein representing to the insurance company that he did not intentionally cause the fire. On January 2, 2018, the insurance company hired its own investigator (Investigator) to inspect the home and offer an opinion as to whether the fire was arson, so that the insurance company could make a decision about whether to pay the claim. Investigator traveled to the scene on January 4, 2018, and spent "four or five hours" on the premises. In his view, the house was not sparsely furnished. While he was in the house, Investigator took photographs and samples of various items. In particular, he filled four lined one-gallon cans, designed to keep gases inside, with various fire debris, with the intent to test the debris samples

for the presence of accelerants. Those samples were later tested, and Investigator testified that they showed no sign of accelerants anywhere near where the fire had started, in the great room.

¶15  Investigator also focused on the two holes in the wall between the great room and the garage. In particular, he examined the relative damage on the two sides of the wall, as well as on the gypsum and the paper in the drywall along the sides of the holes, and concluded that the holes had been created *after* the fire, and not before. In particular, Investigator observed that the gypsum inside the drywall along the edges of the holes was less discolored than the torn paper covering the drywall around the holes, and concluded that the paper had not been torn—an event that would have occurred when the holes were created—until after the fire was over. Investigator also noted the absence of any fire damage inside the garage, observing that a fire burning intensely enough to burn the drywall inside the room "would have gone into the garage" if the holes had existed while the fire was burning.

¶16  After completing his investigation, Investigator notified the insurance company that his preliminary conclusion was that the fire was accidental, and he later submitted a final written report reaffirming that conclusion and detailing the basis for it. Based in part on Investigator's conclusion, the insurance company approved Prisbrey's claim, ultimately paying him "over $350,000 in benefits" for, among other things, repair to the house and for temporary housing.

¶17  After the insurance company paid the claim, the State charged Prisbrey with aggravated arson, a first-degree felony, and with filing a false insurance claim, a second-degree felony. The district court, sitting in the capacity of a magistrate, held a preliminary hearing to decide whether to bind Prisbrey over for trial on these charges; the hearing took place over two days, spaced eleven months apart. During that hearing, the State called three witnesses: Chief and Marshal, who testified as to the events described above; and a witness from the Insurance Fraud

Division of the Utah Insurance Department, who testified that Prisbrey had submitted a claim to his insurance company. After the State rested, Prisbrey called Investigator and Girlfriend. During his testimony, Investigator described his investigation, the conclusion he had drawn from it—that the fire had been accidental—and the reasons for his conclusion. At the end of the hearing, the magistrate declined to bind Prisbrey over on either charge, determining that, even though the State's burden "is not very high," the State had failed to meet that burden.

ISSUE AND STANDARD OF REVIEW

¶18    The State now appeals the magistrate's decision not to bind Prisbrey over for trial. A "decision to bind over a criminal defendant for trial presents a mixed question of law and fact and requires the application of the appropriate bindover standard to the underlying factual findings." *In re I.R.C.*, 2010 UT 41, ¶ 12, 232 P.3d 1040 (quotation simplified). In this context, appellate courts give "limited deference to a magistrate's application of the bindover standard to the facts of each case." *See State v. Ramirez*, 2012 UT 59, ¶ 7, 289 P.3d 444 (quotation simplified); *accord State v. Virgin*, 2006 UT 29, ¶ 34, 137 P.3d 787.

ANALYSIS

¶19    "The preliminary hearing is a fundamental procedural right guaranteed by article I, section 13 of the Utah Constitution." *Ramirez*, 2012 UT 59, ¶ 8. Under that provision, a defendant charged with any felony or any class A misdemeanor is entitled to a preliminary hearing. *See State v. Hernandez*, 2011 UT 70, ¶ 29, 268 P.3d 822; *see also* Utah Const. art. I, § 13. Under a separate constitutional provision, the people of Utah have declared that the "function" of a preliminary hearing "is limited to determining whether probable cause exists" to bind a defendant over for trial. *See* Utah Const. art. I, § 12.

¶20 Our supreme court has noted that "probable cause never had and never will have a precise meaning." *See State v. Clark*, 2001 UT 9, ¶ 11 n.1, 20 P.3d 300 (quotation simplified). In *Clark*, the court held that the "probable cause" standard applicable in preliminary hearings was the same as the "probable cause" standard applicable in the context of arrest warrants, stating that, "at both the arrest warrant and the preliminary hearing stages, the prosecution must present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." *Id.* ¶ 16; *accord* Utah R. Crim. P. 7B(b); *State v. Schmidt*, 2015 UT 65, ¶ 17, 356 P.3d 1204. And the *Clark* court noted that this "reasonable belief" formulation of the probable cause standard was not materially different from the "fair probability" formulation of the probable cause standard applicable in the context of search warrants. *See* 2001 UT 9, ¶ 11 n.1 (stating that, "[t]hough phrased differently, there is little, if any, difference" between the "reasonable belief" standard for obtaining an arrest warrant and the "fair probability" standard for obtaining a search warrant); *see also State v. Decorso*, 1999 UT 57, ¶ 59, 993 P.2d 837 (stating that a search warrant is proper where there is a "fair probability that evidence of the crime will be found in the place or places named in the warrant" (quotation simplified)), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1061.

¶21 While the State bears the burden of establishing the existence of probable cause at a preliminary hearing, *see State v. Lopez*, 2020 UT 61, ¶ 46, 474 P.3d 949, that burden is "relatively low," *see Ramirez*, 2012 UT 59, ¶ 9; *see also Lopez*, 2020 UT 61, ¶ 46 (stating that the burden is "light"). To make the necessary showing, the State "need not produce evidence sufficient to support a finding of guilt at trial or even to eliminate alternative inferences that could be drawn from the evidence in favor of the defense." *Lopez*, 2020 UT 61, ¶ 46 (quotation simplified). The State need only present "reasonably believable evidence—as opposed to speculation—sufficient to sustain each element of the crime(s) in question." *Ramirez*, 2012 UT 59, ¶ 9. And in considering the evidence presented, the magistrate conducting

the preliminary hearing "must view all evidence in the light most favorable to the prosecution and must draw all reasonable inferences in favor of the prosecution." *Clark*, 2001 UT 9, ¶ 10 (quotation simplified).

¶22 But "[d]espite the relatively low evidentiary threshold at a preliminary hearing, a magistrate may deny bindover in certain situations." *State v. Graham*, 2013 UT App 109, ¶ 9, 302 P.3d 824. Indeed, when "[p]roperly construed and applied, the probable cause standard does not constitute a rubber stamp for the prosecution but, rather, provides a meaningful opportunity for magistrates to ferret out groundless and improvident prosecutions." *State v. Virgin*, 2006 UT 29, ¶ 19, 137 P.3d 787. For instance, "when the evidence, considered under the totality of the circumstances, is wholly lacking and incapable of reasonable inference to prove some issue which supports the prosecution's claim, the magistrate is not required to bind a criminal defendant over for trial." *Graham*, 2013 UT App 109, ¶ 9 (quotation simplified). Similarly, a magistrate may properly deny bindover "where the facts presented by the prosecution provide no more than a basis for speculation." *See State v. Jones*, 2016 UT 4, ¶ 13, 365 P.3d 1212 (quotation simplified).

¶23 To be sure, the line separating "speculation" from "reasonable inference" can at times be faint. *See Salt Lake City v. Carrera*, 2015 UT 73, ¶¶ 11–12, 358 P.3d 1067 (stating that the "distinction between a reasonable inference and speculation" is a "difficult" one "for which a bright-line methodology is elusive"); *see also State v. Cristobal*, 2010 UT App 228, ¶ 16, 238 P.3d 1096 (referring to the distinction between reasonable inference and speculation as "sometimes subtle"), *abrogated on other grounds as recognized by State v. Law*, 2020 UT App 74, 464 P.3d 1192. An "inference" is "a conclusion reached by considering other facts and deducing a logical consequence from them." *Carrera*, 2015 UT 73, ¶ 12 (quotation simplified). "On the other hand, 'speculation' is the act or practice of theorizing about matters over which there is no certain knowledge at hand." *Id.* (quotation simplified). As our supreme court has explained, "the

difference between an inference and speculation depends on whether the underlying facts support the conclusion." *Id.*; *see also Salt Lake City v. Gallegos*, 2015 UT App 78, ¶ 10, 347 P.3d 842 (stating that "inferences drawn from facts in evidence are appropriate," but "inferences drawn from inferences are not" (quotation simplified)).

¶24    In this case, the State charged Prisbrey with aggravated arson, a crime that occurs when a person, "by means of fire," "intentionally and unlawfully damages . . . a habitable structure." Utah Code Ann. § 76-6-103(1)(a) (LexisNexis 2017). Arson, like all crimes, may be proved through circumstantial evidence. *See State v. Nickles*, 728 P.2d 123, 126 (Utah 1986) (stating that, in the context of arson, "circumstantial evidence alone may be sufficient to establish the guilt of the accused"). After Chief and Marshal walked through the burned house on New Year's Eve and New Year's Day, they made several circumstantial observations that they thought pointed toward the conclusion that Prisbrey had intentionally set his house on fire. Specifically, the State points to seven such observations that it contends support bindover: (1) that Prisbrey told fire officials that he had used paint thinner to clean up dog-tracked paint in the days leading up to the fire; (2) that Marshal believed the fire had spread more quickly than he would have anticipated; (3) that flammable materials were present in the house, including an "overly dry" Christmas tree, camp fuel in a closet, and gasoline cans in the garage; (4) that Chief believed the house was sparsely furnished, and had heard that Prisbrey had removed items to a storage unit prior to the fire; (5) that Prisbrey failed to extinguish the six candles in the Christmas village display before leaving the house on New Year's Eve; (6) that Prisbrey, Girlfriend, and dog had all left the house prior to the fire; and (7) that two holes were punched into the wall between the great room and the garage, right between where the Christmas village display and the gas cans were located, and that these holes had not been created by fire department water streams.

¶25    After making these observations, Chief and Marshal left the scene, with Marshal commenting that they "would need a [search] warrant to proceed any further." But no warrant was ever sought or obtained; neither Chief nor Marshal conducted any further investigation, and no evidence was presented to the magistrate that any other governmental entity did either.

¶26    Because the State never sought a search warrant, no magistrate was ever asked to evaluate the State's evidence—as it existed at that moment in time—to consider whether probable cause existed to support a search warrant to further investigate the possibility that Prisbrey had committed arson. And we are not asked to consider that question either, although we certainly acknowledge that a request for a warrant, if the State had made one on New Year's Day, may very well have been appropriately granted, given the incomplete information that then existed.

¶27    The question we are asked to consider is not whether probable cause existed to support a search warrant on New Year's Day, but instead whether probable cause existed to support bindover at the conclusion of the preliminary hearing, in light of all of the evidence presented at that hearing. Even if we assume, for the sake of argument, that the State could have demonstrated probable cause for a search warrant on New Year's Day, it does not necessarily follow from that conclusion that probable cause will continue to be present at all subsequent stages of the case. Over the course of a case, inferences that once appeared reasonable may, upon further investigation, be proven to be unreasonable or no longer based on facts in evidence. And in exceptional cases, evidence put forward by a defendant at a preliminary hearing may overcome a *prima facie* showing of probable cause. *See Lopez*, 2020 UT 61, ¶¶ 46–48 (noting the "low bar" the State must surmount at a preliminary hearing, and stating that, given the low bar, "it may be difficult for the defense to overcome a *prima facie* showing of probable cause").

¶28    The magistrate adjudged this case to be one of those rare cases in which the State's evidence did not surmount the low

probable cause bar. And in this unique case, for two related reasons, we discern no abuse of the magistrate's limited discretion in reaching that conclusion.

¶29    First, the State's evidence consisted largely of innocuous facts coupled with unexamined supposition. As noted above, the difference between "speculation" and "reasonable inference" turns on whether there are facts that underlie the conclusion. *See Carrera*, 2015 UT 73, ¶ 12. For many of Chief's and Marshal's "red flags," no underlying facts supported their speculative suspicion. For instance, Chief's supposition about the use of accelerants was based on Prisbrey's account that, some days prior to the fire, he had used paint thinner to spot-clean dog-tracked paint. But paint thinner evaporates over time, and neither Chief nor Marshal knew the date on which Prisbrey had applied the paint thinner, nor did they know whether the paint thinner Prisbrey used was even flammable, or whether he had applied any paint thinner anywhere near the Christmas village display. And neither conducted any follow-up investigation to attempt to ascertain these facts. Under the circumstances, Chief's suspicion that Prisbrey had applied flammable accelerants on a location near the Christmas village display on a date recent enough to matter amounted to nothing more than a "theor[y] about matters over which there is no certain knowledge." *See id.* (quotation simplified). Indeed, during his testimony, Marshal specifically disavowed reliance on any such supposition, informing the magistrate, in response to a direct question, that he "wasn't concerned with accelerant being used" in the great room. The State's attempted reliance upon it now is misplaced.

¶30    Similarly, Chief's supposition that the house was sparsely furnished was, in context, not a reasonable inference supportive of arson. By itself, the fact that a house is sparsely furnished is hardly evidence of arson; what triggered Chief's suspicion was that the *reason* the house was sparsely furnished might have been because Prisbrey had taken items out of the house prior to the fire and placed them in a storage unit. That fact, if true, would potentially be circumstantial evidence of arsonous intent.

But here, nothing other than unexamined supposition supports any such notion. Chief could not even remember who told him about the storage unit, let alone any details about the type and number of items that might have been moved there prior to the fire. And no additional investigation was apparently ever conducted to locate or inspect any such storage unit. Chief's suspicion along these lines was speculative, and Marshal again distanced himself from it, testifying that he included no observations in his report about the house being sparsely furnished. The State's attempted reliance upon this fact now is likewise misplaced.

¶31    In addition, some of the other facts to which the State now points are entirely innocuous, and do almost nothing to support an inference of arson. For instance, the fact that Prisbrey had flammable materials in his house and in his garage was entirely unremarkable. Many Americans have an overly dry Christmas tree in their house on New Year's Eve. And if the presence of camping fuel in a closet and gas cans in the garage were indicative of arsonous intent, it would be the exceptional homeowner who would not fall under suspicion.

¶32    Second, the evidence of the insurance company's investigation presented by the defense at the preliminary hearing served to overcome any remnants of reasonable inference that remained in the State's references to accelerants or the holes in the wall. It bears noting that—at the time it investigated the claim—the insurance company was fully aware that local fire officials were wondering about arson; indeed, that is why the company dispatched its own investigator to the scene. And it goes almost without saying that the insurance company—given the $350,000 insurance claim at stake—had every interest in making sure the fire had not been started intentionally. But despite the insurer's awareness and incentives, its investigation resulted in a conclusion that the fire had been an accident.

¶33    Specifically, Investigator took samples, preserved in lined cans, with the intention of determining whether there was any

evidence that Prisbrey applied paint thinner or other accelerants in locations designed to spread the fire. Tests of the samples yielded no such evidence.

¶34 And Investigator carefully examined the two holes in the wall between the great room and the garage. This piece of evidence was arguably the State's most powerful, and the item upon which Marshal almost entirely rested his conclusion that Prisbrey had intentionally set the fire. But Investigator concluded, based on his analysis of the components of the drywall on each side of the wall and the lack of fire damage in the garage, that the holes had been created *after* the fire.

¶35 The State asserts that Marshal's conclusion to the contrary—that the holes are indicative of arson—is sufficient to compel bindover, pointing out that "when reasonable inferences from the evidence cut both for and against the [S]tate's case, the magistrate lacks discretion to choose between them and must leave such a determination to the fact-finder at trial." *See Schmidt*, 2015 UT 65, ¶ 1. But while Investigator's conclusion represents a reasonable inference drawn from evidence, Marshal's conclusion—on this record—does not. In contrast to Investigator's conclusion, which was based on facts following an investigation, Marshal's conclusion was simply a "theor[y] about matters over which there is no certain knowledge." *See Carrera*, 2015 UT 73, ¶ 12 (quotation simplified). After all, the presence of the holes themselves is not, in itself, indicative of arson; the holes lead to a reasonable inference of arson only if they were created *before* the fire. Only Investigator—and not Marshal—made efforts to thoroughly investigate when the holes were created. Marshal simply asked two individuals (rather than all of the fire crews) if the holes had been created by their water streams (rather than through any other means). After being told that the holes had not been created by fire crews' water streams, Marshal jumped to the unexamined conclusion that the holes must have been created prior to the fire. He did not attempt to ground that conclusion in any actual investigatory facts. He did not examine the holes to compare the burn or water damage on each side of

the wall, and did not talk to any members of the fire crews other than Chief and the local fire marshal.

¶36 After considering all of the evidence as presented at the preliminary hearing, the magistrate determined that the State's case was based on speculation and not on reasonable inferences grounded in evidentiary facts. To be sure, Prisbrey lit six candles in a Christmas village display in his house, and did not extinguish them in his haste to leave the house—with his dog— to propose to Girlfriend. The fire did seem to have spread quickly, perhaps due to the presence of a dry Christmas tree in the vicinity. But beyond that, the State's inferences of arson are simply theoretical, and not grounded in evidence. The State did nothing—or, at least, presented no evidence that it did anything—more to investigate its suspicions. And the State's theories did not hold up against an actual investigation by an entity with every incentive to validate them. Under these unique circumstances, we cannot conclude that the magistrate abused his limited discretion in determining that the State's case was too speculative to support bindover, on either an aggravated arson charge or an insurance fraud charge, which charges in this case rise and fall together.

CONCLUSION

¶37 Accordingly, we affirm the magistrate's decision to decline bindover.

_____

POHLMAN, Judge (dissenting):

¶38 The magistrate, and the majority alike, recognizes that the State's burden of proof at the preliminary hearing is light. Our supreme court characterizes the standard as setting a "low bar," equating it to the "reasonable belief" formulation of the probable cause standard applicable to arrest warrants. *See State v. Lopez*, 2020 UT 61, ¶¶ 46, 48, 474 P.3d 949; *State v. Jones*, 2016 UT 4, ¶ 12, 365 P.3d 1212. Similarly, the majority likens it to the "fair

probability" formulation of the probable cause standard applicable to search warrants. *See supra* ¶ 20.

¶39    Without affirmatively stating that the State could have met that standard with the evidence it amassed had it sought a search warrant on New Year's Day, the majority assumes for the sake of its analysis that the standard would have been met. But it then concludes that this is an "exceptional" case where the defense overcame that showing in the preliminary hearing. *See supra* ¶¶ 27–28. I respectfully disagree.

¶40    The lens through which we must view the evidence presented at the preliminary hearing is from the perspective of a reasonable arresting officer. *Jones*, 2016 UT 4, ¶ 22. "We ask whether *any officer*, viewing the evidence in the light most favorable to the prosecution, could reasonably conclude that a crime was committed and that the defendant committed it." *Id.* (quotation simplified). "And in making that assessment we are required to give the benefit of all reasonable inferences to the prosecution." *Id.* Applying these principles here, I believe the State presented enough evidence to sustain a reasonable determination of probable cause to arrest Prisbrey for aggravated arson and insurance fraud,[4] and I do not share my colleagues' view that Prisbrey undermined that evidence in such a way as to defeat that showing.

¶41    The evidence, when viewed in the light most favorable to the State, paints an incriminating picture. No more than two days before the fire, Prisbrey applied paint thinner all over the house, and he made two large holes in the wall between the

---

4. The State presented evidence at the preliminary hearing that Prisbrey represented to his insurance company, as part of an insurance claim, that he did not intentionally set the fire. Thus, to the extent there was probable cause to bind Prisbrey over for arson, there was also probable cause to bind him over for knowingly making a false or fraudulent insurance claim.

garage and the great room. On the garage side of the wall, he stacked up three containers of gasoline in line with the two holes and within inches of the water heater. He also left a plastic garbage can full of various aerosols and flammable liquids in the garage. On the great room side of the wall, Prisbrey created a Christmas village display, decorated with candles, fake snow, wood, and other combustible materials. And on New Year's Eve, Prisbrey lit the six candles and then left the house at 10:00 p.m., taking Girlfriend and his dog with him. The house was in flames minutes later, and after surveying the scene Marshal opined that the fire was intentionally set. In my opinion, this is enough evidence to sustain an arresting officer's reasonable belief that Prisbrey took intentional steps to burn down his house.

¶42 The majority disagrees, concluding that these facts were largely innocuous or speculative. *See supra* ¶ 29. I see it differently. For example, the majority labels the evidence of Prisbrey's application of flammable accelerants in the house as speculative, stating that neither Chief nor Marshal had gathered enough evidence to know whether "Prisbrey had applied flammable accelerants on a location near the Christmas village display on a date recent enough to matter." *Supra* ¶ 29. But even if these details were not established with fine precision, Prisbrey's own statements were incriminating enough. As far as whether the paint thinner Prisbrey applied was of the flammable variety, Prisbrey admitted it was when he identified the paint thinner in response to Marshal's inquiry about whether there were any ignitable or flammable liquids in the house.[5] And regarding when and where the paint thinner was applied,

_____

5. In addition to Prisbrey's own suggestion that the paint thinner he applied was flammable, Marshal testified that "the overwhelming majority" of paint thinner "is flammable" and that while there probably is a non-flammable variety "out there," it was not something he had seen. This testimony lends further support to the inference that Prisbrey's paint thinner was flammable.

Marshal testified that Prisbrey told him that he had applied it recently—"over the last two days"—and that he had applied it "all over the place."[6]

¶43   Similarly, the majority labels Chief's testimony that the house was sparsely furnished as supposition, stating that his testimony about a storage unit "was speculative." *See supra* ¶ 30. But Chief's testimony about the furnishings, or lack thereof, in the house was based on his own personal observations of the house when he inspected it on the night of the fire. And his testimony about the storage unit was based on a report he received from another officer who told him that Prisbrey "had put stuff" there.[7] Thus, while Chief's testimony on this point may have been less than compelling, I do not believe it was improper for the State to rely on it as one piece of the evidentiary puzzle.[8] *See Carter v. State*, 2019 UT 12, ¶ 75, 439 P.3d 616 ("The

---

6. In my view, Prisbrey's admission that he spread paint thinner in his home could be indicative of guilt even if the paint thinner was not found near the Christmas village display. If Prisbrey intended to burn down his house, he could have distributed the paint thinner in other areas to aid the fire's spread.

7. While not speculative, Chief's testimony about the storage unit was admittedly hearsay. However, rule 7B(b) of the Utah Rules of Criminal Procedure provides that "findings of probable cause may be based on hearsay, in whole or in part." Utah R. Crim. P. 7B(b); *see also* Utah R. Evid. 1102(a) ("Reliable hearsay is admissible at criminal preliminary examinations."); *State v. Lopez*, 2020 UT 61, ¶ 45, 474 P.3d 949 (recognizing that hearsay evidence may be relied upon to establish probable cause in preliminary hearings).

8. Prisbrey and the majority fault the State for not investigating the existence of the storage unit. *See supra* ¶ 30. The State did not introduce evidence of the storage unit, but the absence of that evidence does not establish that no other investigation was

(continued…)

line between a reasonable inference and speculation can be difficult to draw, but a reasonable inference exists when there is at least a foundation in the evidence upon which the ultimate conclusion is based, while in the case of speculation, there is no underlying evidence to support the conclusion." (quotation simplified)).

¶44 Next, the majority concludes that certain evidentiary facts "are entirely innocuous, and do almost nothing to support an inference of arson." *See supra* ¶ 31. In particular, it finds that the existence of flammable materials in Prisbrey's garage and his house "was entirely unremarkable." *See supra* ¶ 31. Even putting aside the overly dry Christmas tree and camping fuel, I do not consider the flammable materials in Prisbrey's garage to be unremarkable. Marshal did not suspect arson simply because Prisbrey was storing some gasoline in his garage. Rather, it was the presence of a plastic garbage can full of various aerosols and flammable liquids along with three containers of gasoline, one with the top removed, stacked up within inches of a water heater bearing a warning label to keep flammable liquids away and lined up directly behind two holes in the wall of the great room in which six lit candles were left unattended that caused him concern. My colleagues believe it would be the exceptional homeowner who would not fall under suspicion if these facts

_____

(…continued)

undertaken and that no additional evidence was adduced. The State may have believed Marshal's testimony on this point was sufficient for purposes of the preliminary hearing. Plus, there is an assumption at the preliminary hearing stage "that the prosecution's case will only get stronger as the investigation continues." *State v. Clark*, 2001 UT 9, ¶ 10, 20 P.3d 300 (quotation simplified). The fact that the State could have presented a stronger case had it brought more witnesses or done a more thorough investigation before the preliminary hearing is not a relevant consideration as long as the liberal bindover standard is met.

were indicative of arson. *See supra* ¶ 31. I submit that these are exceptional facts.

¶45 Finally, I do not agree that evidence of the insurance company's investigation presented by the defense overcame the probable cause established by the State. The evidence presented by Prisbrey is compelling, and a jury could very well doubt Prisbrey's guilt in light of the evidence produced by the insurance company's investigation. But our role "is not to decide whether we think the charges are likely to produce a conviction, or even whether we would be inclined to produce charges if we were in a position to exercise prosecutorial discretion." *Jones*, 2016 UT 4, ¶ 39. Rather, our task is to decide whether a reasonable police officer, viewing the record in the light most favorable to the State, could conclude that Prisbrey committed arson. *See id.* And the insurance company's evidence does not conclusively disprove the State's evidence; it instead presents a conflict in the evidence that neither we, nor the magistrate, are permitted to weigh. *See id.* ¶ 24.

¶46 In particular, the fact that Investigator's samples yielded no evidence of paint thinner in the house, *see supra* ¶ 33, does not disprove Prisbrey's own admissions that he spread accelerant throughout the home. It instead presents a conflict for the factfinder to resolve. Similarly, that Investigator opined that the two holes in the wall between the great room and the garage were created after the fire, and not before, *see supra* ¶ 34, does not establish it as fact. Marshal testified that he asked Chief and the local fire marshal if the fire department made the holes "during suppression" of the fire, and they said they did not.[9]

---

9. The majority states that Marshal specifically asked if the holes were created by the firefighters' water streams. *See supra* ¶ 35. To be sure, there was discussion of what evidence would have been present had the holes been created by water streams. But Marshal asked a more general question. He twice testified that he asked if the holes were made by the fire department's

(continued…)

While a factfinder may not be allowed to rely on such hearsay at trial, for purposes of the preliminary hearing, the State was entitled to rely on it to demonstrate probable cause. *See supra* ¶ 43 note 7. And while a factfinder would have every right to reject the firefighters' recollections in favor of Investigator's opinion and scientific investigation, the State was not obligated to rebut the defense's theories to meet the liberal bindover standard. "A strong argument the other way isn't enough to foreclose a trial on the merits. Weighing evidence in search of the most reasonable inference to be drawn therefrom is the role of the factfinder at trial." *Jones*, 2016 UT 4, ¶ 24 (quotation simplified).

¶47 In sum, I conclude that the magistrate exceeded his discretion in refusing to bind Prisbrey over for trial, and I would reverse its decision and remand this case for further proceedings. The State's case was met with a persuasive rebuttal, and weaknesses in its case were exposed in the preliminary hearing. But the question before us is whether the State, considering the evidence in the light most favorable to it, demonstrated probable cause to arrest Prisbrey for arson. For all these reasons, I believe that it did.

———————

(…continued)
suppression, and the answer was no, the firefighters "did not make them." The only suggestion that the holes could have been made by the fire department in search of a hot spot came from defense counsel in cross-examination of Chief. And Chief testified that at times drywall is pulled down to look for hot spot exposure, but that the department tries to do minimal overhaul in the area where it believes the fire originated.